UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JEFFREY M. HEALEY,              )
                               )
        Plaintiff,             )
    v.                         )   CIVIL ACTION
                               )   NO. 01-11099-PBS
ROBERT MURPHY, et al.,         )
                               )
        Defendants.            )
and                            )
                               )
EDWARD GIVEN,                  )
                               )
        Plaintiff,             )
    v.                         )   CIVIL ACTION
                               )   NO. 04-30177-PBS
ROBERT MURPHY, et al.,         )
                               )
        Defendants.            )


**MEMORANDUM AND ORDER**

March 29, 2013

SARIS, C.U.S.D.J.

## I. INTRODUCTION

Plaintiffs Jeffrey Healey and Edward Given, who were civilly committed as sexually dangerous persons after completing their criminal sentences, bring this action pursuant to 42 U.S.C. § 1983 challenging the sex offender treatment program and their conditions of confinement at the Nemansket Correctional Center in Bridgewater, Massachusetts (the "Treatment Center"). They seek equitable relief (not monetary damages) against the Massachusetts Department of Correction ("DOC"), its Commissioner Luis Spencer,[1]

---

[1] Luis Spencer became acting Commissioner in January 2011 and Commissioner on April 27, 2011. Michael Corsini became the

and the Superintendent of the Treatment Center, Michael Corsini.
In addition, Healey has asserted claims against the defendants
for failure to comply with the provisions of the Treatment
Center's Amended Management Plan ("the Plan") adopted as a result
of the consent decree litigation before Judge David Mazzone,
which ended in 1999.  This is not a class action.

Plaintiffs contend that the DOC defendants have failed to
implement any meaningful treatment program and complain about
many aspects of their conditions of confinement, which they claim
are unnecessarily punitive and unrelated to the purposes of the
Treatment Center.  Among many other things, they argue that they
have not been provided with psychopharmacological treatment for
deviant sexual impulses, and that the DOC has not implemented the
community access program, mandated both by state statute and the
Plan.

The DOC defendants contend plaintiffs' conditions of
confinement are not excessively restrictive and that the sex
offender treatment program complies with the Plan, which provides
them a degree of operational discretion.  Emphasizing the need to
provide a secure institution, they point out that residents at
the Treatment Center include murderers and other violent sex
offenders, and emphasize that only two percent of the sex
offenders eligible for commitment are eventually found to be

Treatment Center Superintendent in March 2010.

dangerous and committed to the Treatment Center.  Defendants
maintain that the plaintiffs' failure to progress in sex offender
treatment is the result of their own actions, such as the failure
to attend treatment programs, the failure to comply with
treatment recommendations, and the refusal to conform their
behavior to the rules and regulations of the Treatment Center.
While not opposing the request for a psychopharmacological
evaluation, defendants do oppose an injunction because they say
they have offered the treatment and are developing a protocol.

After consideration of the evidence, the view of the
Treatment Center on January 12, 2012, and the arguments advanced
by counsel, I make the following findings of fact and conclusions
of law.  In particular, I find (1) the DOC defendants violated
the Plan and the Constitution by failing to provide plaintiffs
with a psychological evaluation for possible pharmacological
treatment using professionally reasonable standards, and (2) that
defendants violated the Plan and state law by failing to provide
a functioning community access program.  I find in favor of the
DOC defendants on all other issues.

## II.  <u>PROCEDURAL BACKGROUND</u>

In 2001, plaintiff Jeffrey Healey filed his complaint
challenging the conditions of confinement and the adequacy of sex
offender treatment at the Treatment Center.  In 2004, Healey's
lawsuit was consolidated with a similar action filed by

plaintiffs Edward Given and Joel Pentlarge, a former resident
committed at the Treatment Center, who was released in January
2006 after being adjudicated as not sexually dangerous.
Pentlarge was dismissed from the lawsuit in June 2011 after he
and Given agreed to waive their claims for monetary damages,
leaving only claims for declaratory and injunctive relief.

Retired Judge Nancy Gertner presided over this case until
she left the bench in August 2011.  She conducted a view of the
Treatment Center, and held a 10-day bench trial in July 2011.
However, she never issued an opinion, as the parties remained in
settlement negotiations when she retired.  The settlement broke
down, she retired, and the case was randomly assigned to me.

In December 2011, I certified, pursuant to Fed. R. Civ. P.
63, that I was familiar with the record and determined that the
case may be completed without prejudice to the parties.  See Fed.
R. Civ. P. 63; Riley v. Nat'l Lumber Co., 584 F.3d 27, 32 (1st
Cir. 2009)("[T]he successor judge in a nonjury trial may proceed
with a matter if he (1) certifies that he is familiar with the
case and determines that the case may proceed without prejudice
to the parties, and (2) if requested by a party, recalls any
witness whose testimony is material and disputed.").  I chose to
recall the two plaintiffs and Pentlarge to assess their
credibility, and the defendants chose to recall certain witnesses
and present new testimony to address changes at the Treatment

4

Center that had taken place since the first trial.  In January 2012, I conducted a view of the Treatment Center and held a six-day bench trial.  Defendants submitted certain statistical information after the trial which had been requested by plaintiffs.[2]

After the resolution of multiple dispositive motions over the past decade, the following claims remain:

As to Healey: (1) Defendants have violated the Plan as an enforceable court order (Count I); (2) Withholding psychological care violates his Eighth Amendment rights (Count III); (3) Failure to provide adequate treatment violates his Fourteenth Amendment substantive due process rights and breaches defendants' duties under Mass. Gen. Laws ch. 123A, § 2 (Count IV); and (4) Forcing him to exercise in the wire "cage" while he is under disciplinary segregation violates his Fourteenth Amendment substantive due process rights (Count V).

As to Given: (1) Conditions at the Treatment Center fail to provide the "least restrictive alternative" in violation of his due process rights (Count I); (2) The Treatment Center's telephone system violates his First Amendment and substantive due process rights (Count II); (3) The waiver of confidentiality to obtain sex offender treatment violates his Fifth Amendment rights

_____

[2]  While the relevancy of the documents is disputed, neither party asked to present additional testimony or oral argument about the data.

(Count III); (4) Failure to provide adequate treatment violates his Fourteenth Amendment substantive due process rights (Count IV); and (5) Failure to provide accommodations that meet the minimum standards for human habitation violates his Fourteenth Amendment substantive due process rights (Count V).

### III.   STATUTORY AND LITIGATION BACKGROUND

#### A.   The Statutory Scheme - Chapter 123A

The Massachusetts Sexually Dangerous Persons Law was passed in 1947.  See Mass. Gen. Laws ch. 123A, § 1 et seq.  The initial law was premised on the assumption that sex offending is caused by a severe mental illness which can be treated if the offender is given a one-day to life commitment sentence at a mental health institution to participate in an intensive treatment regimen. See King v. Greenblatt, 53 F. Supp. 2d 117, 118 (D. Mass. 1999)("King IV").  The statute was amended in 1954 to provide for the establishment of the Treatment Center, which opened three years later.  See id. at 118.

Mass. Gen. Laws ch. 123A, § 9 provides for a periodic review of a civilly-committed resident's sexual dangerousness in the form of a trial.  Pursuant to § 9, residents may file petitions with the court annually requesting release from the Treatment Center.  Upon a jury determination that an individual is no longer sexually dangerous, he is returned to a correctional institution to complete his criminal sentence, or, if he has not

6

received a criminal sentence, or has completed it, he is released to the public.  _See_ _id._ at 118 n.2.

**B.    The _King_ Litigation and Consent Decrees**

There is a forty-year long history of litigation brought by civilly committed residents concerning allegedly unconstitutional conditions and practices at the Treatment Center.

In 1972, residents at the Treatment Center brought two separate actions in district court asserting constitutional challenges to the conditions of confinement and adequacy of treatment at the facility.  _See_ _King v. Greenblatt_, 127 F.3d 190, 191 (1st Cir. 1997) ("_King II_").  In 1974, after finding that conditions at the Center were unconstitutional, the court entered three different consent decrees, which continued to govern operations at the Treatment Center for the next 25 years.

At the time the consent decrees were entered, conditions at the Treatment Center were, in the words of the Judge Mazzone, "deplorable."  _King IV_, 53 F. Supp. 2d at 119.  Residents were housed in cramped, poorly furnished cells that had been built in 1895 and contained no sinks or toilets.  _Id._  Residents were forced to defecate and urinate in small chamber pots and emptied their human waste daily into a service sink at the end of their floor.  _Id._  Their water supply, which came from the highly polluted Taunton River, failed to meet safe drinking water standards.  _Id._  The sewage system had not been worked on since

7

1934, and problems with the heating system left some cells without heat for several days.  Id.

In addition to the dismal physical conditions, there were very few services, programs, or recreational opportunities available to residents.  The facility had only one licensed doctor and no nurses.  Id.  There was no library, educational classes, exercise facilities, or community access programs.  Id. All residents were housed under maximum security conditions and afforded little movement.  Id.

Originally, the consent decrees provided that the Treatment Center would be treated as a Department of Mental Health ("DMH") facility.  DMH would have primary responsibility over residents and treatment, while DOC would have responsibility for custodial personnel.  Id. at 119-20 & n.5.  Under the consent decrees, residents would be entitled to "the least restrictive conditions necessary to achieve the purpose of commitment."  DMH and DOC would act jointly to "improve physical conditions," "implement a meaningful work program," and have "a system of differing security for different categories of patients . . . to permit less restrictive conditions for those patients not requiring maximum security."  Id. at 120 (quoting consent decrees; punctuation in original).  Additionally, the defendants were required to "submit a plan to offer therapeutic, educational, vocational, and avocational programs at the Treatment Center and

a provision for a day or other short-term release to allow residents to participate in approved programs outside of the facility." <u>Id.</u>  While the consent decrees led to significant improvements in the physical conditions, as well as in the availability of treatment, programming, and work opportunities at the Treatment Center, they also led to a "stream of litigation" that arose mainly from the tension created by the "dual management of a hybrid facility whose purpose was to provide effective treatment, for which DMH was responsible, in a secure setting for which DOC was responsible." <u>Id.</u>

**C.   The Abolition of Civil Commitments**

By the end of the 1980s, the focus of treatment for sex offenders shifted.  A review panel authorized by the Massachusetts Legislature in 1988 "concluded that the mental health approach to sex offender treatment was no longer effective because sexual violence is primarily a form of anti-social behavior which can be controlled, but not 'cured.'" <u>Id.</u> at 121. The panel recommended that civil commitments be abolished and that the DOC develop a voluntary program for treatment of sex offenders.  <u>Id.</u>  Consistent with these recommendations, civil commitments were abolished in 1990, and were not reinstated until nine years later.  In the interim, the <u>King</u> litigation continued with respect to persons civilly committed under the old law.

In 1994, the Massachusetts Legislature enacted legislation

which amended Chapter 123A to shift complete control over the
Treatment Center to the DOC and to add "custody" to the previous
statutory goals of "care, treatment, and rehabilitation" of
civilly-committed residents.  King II, 127 F.3d at 193; King IV,
53 F. Supp. 2d at 121.  These developments triggered efforts to
modify the consent decrees to conform to the statutory changes.
Id.  Also in 1994, as part of the King litigation, Judge Mazzone
appointed counsel for a group of residents calling themselves the
"Class of 48 + 1", who had submitted a letter to the court
alleging additional violations at the Treatment Center.  Id.
Plaintiff Jeffrey Healey was one of the Class of 48 + 1.
Stipulated Facts ("SF") ¶ 9.

Before the court would allow the consent decrees to be
modified, it urged the DOC to provide a detailed plan to describe
how it planned to operate the Treatment Center.  King IV, 53 F.
Supp. 2d at 121-22.  The DOC developed a plan for the management
and administration of the Treatment Center.  Id. at 122.  The
original plan, which consisted of 136 pages, "set forth in great
detail the policies and procedures DOC would follow in operating
the Center."  Id.

During the period when the DOC was developing the plan, a
new facility was constructed on the grounds of the Treatment
Center in order to house 300 state inmates who were participating
in the DOC's sex offender treatment program.  Id.  In connection

10

with this development, the DOC submitted a plan on how it would accommodate the influx of inmates and maintain its statutory obligations to keep civilly-committed residents separate and apart from prisoners.  Id.  Judge Mazzone noted that the presence of the inmate population at the facility remained "the greatest challenge to DOC's management of the Center."  Id.

D.   **The Amended Management Plan**

On September 26, 1994, the DOC filed its proposed management plan with the court for approval.  Rather than approving the plan, the court, on July 31, 1995, stayed implementation of the plan's central components and directed the parties to attempt to reach agreement on matters where they disagreed.  Id. Subsequently, the parties engaged in discussions with the help of a Special Master, but their efforts to achieve consensus were unsuccessful.  Id.

Eventually, in 1996, the court reviewed the plan, determined that it would meet the goals of treatment, security, and the protection of residents' rights, and allowed DOC's motion to modify the consent decrees.  Id.  Nevertheless, the court directed DOC to submit an amended management plan that would address certain concerns that had been raised by the parties. Id.  Consistent with that order, DOC filed the Amended Management Plan with the court on November 29, 1996.  Id.  According to Kinq IV, "[i]t is that Plan, together with the policies and procedures

11

implemented under that Plan, which are the governing documents for the Treatment Center." Id.

The Amended Management Plan provides detailed policies and procedures for DOC's administration of the Treatment Center and the integration of the Treatment Center program with DOC's prison sex offender treatment program. Ex. 1 at 4. The Plan focuses on seven main areas of program administration. They include: (1) management and staffing; (2) clinical treatment; (3) educational and vocational treatment; (4) behavior management; (5) resident management and operations; (6) the community access program; and (7) integration of the Treatment Center with the prison program for sex offenders. They will be discussed in more detail to the extent they are directly relevant to plaintiffs' claims.

Despite its level of detail and specificity, the Plan contemplates a certain amount of operational discretion. As noted in the Plan's conclusion, "[t]he field of sex offender treatment in the Commonwealth is not static." Id. at 48. It further provides in relevant part:

> It is clear that a pragmatic and flexible philosophy is the key to managing this unique facility in a changing environment, so that residents and inmates may receive meaningful treatment in a safe and secure setting. The amended plan herein described offers significant improvements over the original plan offered two years ago. It is the [DOC's] intent that by assessing and refining the elements of the plan as they are implemented over the next year, the policies and practices that emerge will be better still.

Id. Consistent with the consent decree, the Plan requires that residents "be maintained in the 'least restrictive conditions' of confinement." Id. at 6.  It also requires the DOC to provide residents with "the best current treatment methodology." Id. at 4.

**E.    Termination of the Consent Decrees**

Although the court allowed DOC's motion to modify, it denied, without prejudice to renew in one year, its contemporaneous motion to vacate the consent decrees. King IV, 53 F. Supp. 2d at 122.  In the interim, the court wanted to evaluate and monitor the implementation of the Plan in order to determine whether DOC was committed to its stated goals of providing effective treatment in a secure setting, and whether, consistent with the modified consent decrees, it was administering the Plan so as to insure "that patients [were] subject to the least restrictive conditions necessary to achieve the purposes of commitment." Id. at 124.

The consent decree litigation finally came to a close in 1999, when the court granted DOC's motion to terminate the consent decrees. Id. at 139.  The court determined that under all the circumstances then existing at the Treatment Center, the available treatment was effective and provided under the least restrictive conditions. Id. at 135.  Nevertheless, the court emphasized that its decision "does not preclude [residents] from

challenging events on the basis of constitutional or other protected rights" and that residents "may bring an action to enforce the terms of the Plan" or "to initiate a new round of proceedings designed to show that post-termination conditions actually do violate their federally protected rights." Id. at 137 (internal quotations and citation omitted).

**F.   Reinstating Civil Commitments**

In September 1999, just months after the King litigation was completed, Chapter 123A was amended again. See St. 1999, ch. 74, §§ 3-8.  Significantly, the 1999 amendments reinstated civil commitments.  See Commonwealth v. Bruno, 432 Mass. 489, 491 (2000).  They also established a new definition of sexually dangerous persons, as well as new procedures for adjudicating persons as sexually dangerous. Id. at 494.  Thus, after a period of almost ten years during which there were "no new 'sexually dangerous person' classifications and no new commitments permitted," the population at the Treatment Center began to increase. Id. at 494.

Consistent with earlier versions of Chapter 123A, the amended statute's "dual goals" remained: "namely to protect the public from sexually dangerous persons, and to provide them treatment, and rehabilitation." Id. at 500.  The statute continued to be deemed "nonpunitive and therefore civil" as opposed to criminal. Id. (internal quotations omitted).  It

14

provided for commitment of a period of one-day to life of persons
who have been found either to be "likely to engage in sexual
offenses if not confined to a secure facility," or to have "a
general lack of power to control . . . sexual impulses . . . and
. . . likely to attack or otherwise inflict injury."  Mass. Gen.
Laws ch. 123A, § 1.  Thus, the Legislature determined that
"because such persons are likely to commit future harm, confined
commitment appears to be the only viable form of commitment."
Bruno, 432 Mass. at 502.  Nevertheless, the Legislature's
intention in enacting Chapter 123A remained "remedial."  Id. at
500.

Although the Treatment Center houses both state prison
inmates participating in sex-offender treatment and civilly
committed residents, in 2001 the Massachusetts Superior Court
ruled that residents at the Treatment Center must be kept
"separate and apart" from prisoners "at all times" in accordance
with state law.  Durfee v. Maloney, Nos. CIV. A. 98-2523B, CIV.
A. 98-3082B, 2001 WL 810385, at *15 (Mass. Super. Ct. July 16,
2001).  Since then, in addition to being housed in different
units, state inmates and residents have not been permitted to
intermingle anywhere throughout the facility or to participate
together in any programs or services.

The DOC continues to operate the Treatment Center pursuant
to Chapter 123A, § 2.  SF ¶ 16.  Thus, it has had exclusive

control over the care, custody, treatment and rehabilitation of civilly committed residents at the Treatment Center since 1994, when jurisdiction over the Center was transferred from DMH to DOC.

As of October 5, 2011, 254 sexually dangerous persons were civilly committed to the custody of DOC.  Eight-one were committed under the pre-1990 version of Chapter 123A.  Some were also serving first-degree life sentences.  Residents stay at the Treatment Center an average of 14.5 years, with the length ranging from one year to more than 40 years.  Ex. 642.

## G.   The Release Process

In 2009, the Massachusetts Supreme Judicial Court altered the way in which residents may be discharged from the Treatment Center.  The court held that if two Qualified Examiners[3] opine that a resident is no longer sexually dangerous, his section 9 petition must be granted, and the resident is entitled to be released from the Treatment Center without a trial.  See In re Johnstone, 453 Mass. 544, 545 (2009); id. at 553 ("If neither of the qualified examiners is of the opinion that the petitioner is currently a sexually dangerous person, the Commonwealth cannot .

_____

[3] A Qualified Examiner is "a [licensed] physician . . . who is either certified in psychiatry by the American Board of Psychiatry and Neurology or eligible to be so certified, or a [licensed] psychologist; provided, however, that the examiner has had two years of experience with diagnosis or treatment of sexually aggressive offenders and is designated by the commissioner of correction."  Mass. Gen. Laws ch. 123A, § 1.

. . meet its burden of proof at trial.").

Residents are evaluated every year by the Community Access Board ("CAB"). The CAB is statutorily mandated to conduct an annual review of each resident's treatment plan and vote on whether or not the CAB believes that the resident remains sexually dangerous. (Tomich, I-7, 131); Mass. Gen. Laws ch. 123A, § 6A. The CAB is comprised of five members: three psychologists employed by the DOC and two employed by the treatment provider. (Tomich, I-7, 132-33).

The CAB itself does not have authority to release a resident from custody, as residents can only be released through the section 9 judicial process. Prior to the Johnstone decision, if the CAB, along with two Qualified Examiners, all voted unanimously that a resident was not sexually dangerous, the DOC would inform a court presiding over a section 9 petition that it could not make a prima facie case that the petitioner remain sexually dangerous, and the petitioner would be released from the Treatment Center. During this time, very few residents were released. See Ex. 334 at 6. From 2002 to 2011, the CAB conducted 1,837 annual reviews. Out of this total, the CAB unanimously voted that a resident was not sexually dangerous 17 times. Ex. 642.

Furthermore, while the CAB cannot file a section 9 petition on behalf of a resident, the Commonwealth can. However, the only

time CAB Chairperson Niklos Tomich, Psy.D., recalls the Commonwealth exercising this option was when a resident was so infirm he needed medical attention not available at the Treatment Center. (Tomich, II-5, 140). Tomich is Director of Forensic Services and has been Chair of the CAB since July 2009.

From April 2009, the time Johnstone was decided, until March 2012, 24 residents were released after two Qualified Examiners opined that they no longer remained sexually dangerous. Doc. No. 423 (Summary of Community Access Board Reports). In 14 of those cases, the CAB had disagreed with the Qualified Examiners and voted that those residents remained sexually dangerous. Id. That is, in 58 percent of cases, the CAB opined that residents should continue to be confined at the Treatment Center when two Qualified Examiners believed they could be released safely into the community.

## IV.   **FACTUAL FINDINGS**

## A.   **The Plaintiffs**

### 1.  **Healey**

Plaintiff Jeffrey Healey has been confined to the Treatment Center for nearly all of his adult life. On February 24, 1966, when Healey was 17 years old, he was convicted of one count of indecent assault and battery on a child under 14 years of age, and one count of assault and battery by means of a dangerous weapon. In lieu of a criminal sentence, he was civilly committed

18

to the Treatment Center for a period of one-day to life.  SF ¶ 2.
Ten years later, in August 1976, he was released into the
community.  In December 1977, after he was arrested for sexually
abusing a boy, Healey was returned to the Treatment Center.  Id.
¶ 3.  Healey was subsequently convicted of one count of carnal
abuse on a child under 14, and two counts of indecent assault and
battery on a child under the age of 14.  Id. ¶ 4.  Healey
completed his criminal sentences on March 15, 1997, but has
remained civilly committed at the Treatment Center since that
time.  Id. ¶ 6.

Since 1968, Healey has filed many unsuccessful section 9
petitions for discharge from the Treatment Center.  See SF ¶ 7.
Healey currently suffers from asthma, a heart condition, and
diabetes, and has been diagnosed with pedophilia, bipolar
disorder, and depression.  He has borderline intellectual
functioning with an IQ of 78.

**2.  Given**

Plaintiff Edward Given has been confined at the Treatment
Center since November 2000.  See SF ¶¶ 12-13.  In 1983, Given was
convicted of indecent assault and battery on a child under the
age of 14, and sentenced to one year in a house of correction,
with probation and conditions.  In 1991, Given was convicted of
raping a child under the age of 16, indecent assault and battery
on a child under the age of 14, indecent assault and battery on a

19

mentally retarded person, and unnatural rape of a child under the age of 16.  Id. ¶ 11.  He received a sentence of 9 to 12 years at MCI-Cedar Junction.  Id.

Given completed his criminal sentence on November 13, 2000, and was temporarily committed to the Treatment Center pending the District Attorney's petition to commit him pursuant to Chapter 123A.  Id. ¶¶ 12-13.  On July 12, 2001, Given was civilly committed to the Treatment Center.  Id. ¶ 14.  Since that time, Given has filed three separate section 9 petitions.  On each occasion, a jury found that Given remained sexually dangerous.  Id. ¶ 15.  Given has been diagnosed with pedophilia, bipolar disorder, and depression.

### 3.    Treatment Provided to Plaintiffs

Both plaintiffs have received sex offender treatment at the Treatment Center, which primarily has consisted of cognitive behavioral therapy group sessions.  They have also taken numerous psychoeducational classes.  They participated in community-building activities when they were available prior to 2002, including Family Day, holiday parties, and barbeques.  Healey was also involved in the whist, bridge, and stamp clubs, before they were terminated.  Healey has also taken part in specialty groups, such as anger management, behavioral therapy, and drama therapy.

Over the years they have been civilly committed, both plaintiffs have skipped group therapy meetings and

psychoeducational classes for a variety of reasons.  Healey
stopped participating in treatment at times because he felt
cognitive behavioral therapy was not working, he felt he did not
need treatment anymore, and his lawyer advised him to drop out of
treatment.  (Healey, II-2, 31-34).  Healey has also disrupted
treatment activities on occasion, including screaming at
therapists during primary group sessions and unit meetings.
(Orlandi, I-10, 70).  Given, at times, has chosen not to
participate in treatment so he could work on his legal cases and
attend his Treatment Center job. (Given, II-2, 141; I-4, 57).

**B.   <u>The Providers of Treatment</u>**

**1.   Justice Resource Institute**

From 1992 to June 2002, mental health and sex offender
treatment at the Treatment Center was provided by the Justice
Resource Institute ("JRI"), first pursuant to a contract with the
Department of Mental Health and subsequently through contracts
with the DOC.  SF ¶ 23.  In late 2001, the relationship between
the DOC and JRI deteriorated.  Dr. Barbara Schwartz, JRI's
clinical director at the Treatment Center since 1992, had become
highly critical of what she believed was DOC's lack of commitment
to JRI's treatment program.  In a letter to her supervisor dated
November 11, 2001, Dr. Schwartz wrote: "I can no longer tolerate
the way that DOC has been treating us.  I would never have come
to Massachusetts if I had felt that my job was to keep people in

prison.   My life's work has been to rehabilitate sex offenders, not incarcerate them . . ."

When JRI managed sex offender treatment at the Treatment Center, it instituted a relapse prevention model focusing on the following treatment modalities: cognitive behavioral therapy, behavioral therapy, psychoeducational classes, experiential therapy, and community-building activities.  (Schwartz, I-2). Cognitive behavioral therapy is a form of talk therapy where therapists help residents identify mental distortions they may have, and then assist in changing their behaviors.  (Saleh, I-6). Cognitive behavioral therapy consisted of primary groups and speciality groups.  Primary groups of approximately 10 residents and two therapists met twice per week for one and a half hours. Speciality groups were created on an as-needed basis to assist residents with specific issues, such as alcohol or sex addiction. (Schwartz, I-2).

Behavioral therapy attempted to correct maladaptive behaviors through the use of interventions.  One example is olfactory aversion therapy, where residents have to break open and smell a noxious ammonia capsule whenever they have deviant sexual thoughts.  (Saleh, I-6).  Under JRI, the Treatment Center offered approximately 15 to 20 classes in a 12-week period, on a variety of issues related to sex offender treatment from anger management to human sexuality.

Experiential therapy, including art, music, and drama, expanded upon what the residents learn from cognitive behavioral therapy, and was often utilized within primary groups.

Community-building activities were designed to help residents develop appropriate social skills and allow them to interact with each other, their families, and treatment staff in a social setting.  These activities included monthly unit parties; holiday parties for Christmas and New Year's Day; barbeques on Memorial Day, the 4th of July, and Labor Day; recreational clubs such as whist, bridge, and stamp collecting; and Family Day, where residents would come together in the visiting room and socialize with family members and treatment staff. (Schwartz, I-2; Healey, I-3).  In the final years of JRI's tenure at the Treatment Center, the number of community-building activities decreased, and the activities themselves became increasingly restrictive.  For example, residents were no longer allowed to order food from outside the Center during social events.  (Schwartz, I-2).

Between 1992 and 1995, JRI had contracts to provide both sex offender therapy and medical services at the Treatment Center. During this time, psychiatrists prescribed eligible residents certain drugs (i.e., SSRIs)[4] to address intrusive deviant sexual

---

[4] SSRIs, or selective serotonin reuptake inhibitors, are anti-depressants used to decrease an individual's paraphilic symptoms.

fantasies and obsessive-compulsive focus on deviant sexual
activities.  (Schwartz, I-2, 62-63).  In 1995, JRI turned over
maintenance of the Treatment Center's medical services to
Correctional Medical Services ("CMS").  CMS continued to provide
psychopharmacological treatment, until it was terminated sometime
during the tenure of then-Superintendent Robert Murphy.
(Schwartz, I-2).  JRI staff spoke with Superintendent Murphy
about the possibility of providing anti-androgen therapy[5] at the
Treatment Center, but he told them that JRI's contract did not
have a pharmacological component, and the Treatment Center had no
psychiatrist on staff to prescribe anti-androgens.  (Murphy, I-
4).

##  2.    The New Treatment Provider, FHS

In 2002, JRI and DOC parted ways, and DOC awarded a new
contract to Forensic Health Services, Inc. ("FHS") for
comprehensive assessment, treatment and release preparation
services to sex offenders.  SF ¶ 26.  FHS has operated the
Treatment Center's sex offender treatment program since then.  In
2008, FHS was acquired by MHM Correctional Services, Inc.
("MHM").  Id. ¶ 27.  Its current contract with DOC runs from July
1, 2011 to June 30, 2014, with three two-year renewal options.
Id. ¶ 29.  MHM was also awarded DOC's contract to provide

---

[5] Anti-androgens, also known as hormonal therapy or chemical
castration, decrease a man's testosterone level to help him
control his deviant sexual urges.

comprehensive mental health services to its facilities, including
the Treatment Center.  Its latest contract runs from July 1, 2007
to June 30, 2012, with additional renewal options.  Id. ¶¶ 30-31.

When FHS took over the treatment program from JRI in 2002,
it continued to follow a relapse prevention model, using
cognitive behavioral therapy through primary and specialty
groups, behavioral therapy, and psychoeducational classes.
Community-building activities, for the most part, ceased to exist
soon after FHS took charge.  Family Day, holiday parties,
barbeques, unit parties, and many recreational clubs were all
terminated. (Healey, I-3; Given, I-4).  The number of
psychoeducational classes was also reduced significantly from
those offered by JRI. (Healey, II-1); Ex. 569 at 2 (list
comparing psychoeducational class offerings by JRI and FHS).
Furthermore, certain experiential therapies like drama therapy
were phased out because FHS staff believe that they had not been
shown to reduce recidivism among sex offenders.  (Peltzman, II-
3).

After Judge Mazzone lifted the consent decrees in June 1999,
the conditions at the Treatment Center became harsher.  (Healey,
I-3, 42-43; Schwartz, I-2, 55; Given, I-4, 21).  One reason for
the more restrictive conditions has been the DOC's response to
the Durfee v. Maloney decision in 2001, ruling that civilly
committed residents and criminal inmates must be kept "separate

and apart . . . at all times."  The DOC ended up cutting each
group's time within the common facilities in half, including
visitation time and access to classes, the library, gym, and
exercise yard.  See Ex. 322 at 15; Ex. 323 at 14; (Pentlarge,
I-2, 115-16).  Plaintiffs have made challenges to a variety of
their changed conditions of confinement in this litigation.

### 3.    The new "good lives" model of sex offender treatment

FHS's latest contract with the Treatment Center began in
July 2011.  Under this new contract, it has changed its sex
offender treatment from a "relapse prevention" model of cognitive
behavioral therapy to a "good lives" model, delivered in the
context of a therapeutic community, a living arrangement in which
a group of individuals are housed together for therapeutic
purposes.  (Peltzman, II-2).  Based on the literature of Dr. W.L.
Marshall, a leading academic in the field of sex offender
treatment, the "good lives" model moves away from identifying
areas that a sex offender should avoid and areas of weaknesses to
identifying their strengths and skills that will help them make
progress in treatment. (Peltzman, II-2).

The "good lives" model is based on three principles: risk,
needs, and responsivity.  First, treatment providers determine
the level of risk of each resident.  This includes both a
resident's static risk (that is, the risk that cannot change),
and dynamic risk, risk that can change.  To assess dynamic risk

26

in residents at the Treatment Center, FHS staff use the STABLE-2007 list of 13 dynamic risk factors. Second, based on the level of risk, treatment providers identify the individual treatment needs for each resident. Third, to determine "responsivity," treatment providers analyze the individual treatment needs based on the strengths and weaknesses of each resident, including learning styles, disabilities, and academic background. (Peltzman, II-2).

FHS developed the sex offender treatment program, including the content of psychoeducational courses, based on considerable research in the field. (Peltzman, II-3, 52, 117; I-10, 41; I-9, 85-86). Both CAB Chairperson Niklos Tomich, Psy.D., and FHS Director of Assessments Brooke Peltzman, Psy.D., were part of the committee that created and implemented the new "good lives" model of treatment. Tomich has more than 20 years of experience treating sex offenders, was appointed to Massachusetts' Sex Offender Registry Board, and is a member of several professional organizations including the Association for the Treatment of Sexual Abusers ("ATSA"). (Tomich, I-7, 130, 142). Peltzman is a licensed clinical psychologist, who began working with sex offenders in 2004. She is a member of ATSA and has been employed by the Treatment Center since 2007. (Peltzman, II-2, 190, 194). When developing the new model of treatment, Tomich and Peltzman evaluated other state and federal programs, consulted ATSA

27

professional standards, and spoke with experts in the field of sex offender assessment programming, risk, and treatment of sex offenders with special needs. (Peltzman, II-2, 193-96, 210, 212-16, 226; Tomich, II-5, 150).

In order to provide this new type of sex offender treatment, in November 2011, FHS staff began a process of assessing all residents at the Treatment Center. FHS staff divided the housing units into three categories: Therapeutic Communities, Assessment Treatment Preparation Units ("ATPU"), and units for residents who refuse treatment. Residents who were motivated and ready to embrace the new model were directly placed in Therapeutic Communities units. Residents who required a more detailed evaluation to determine whether they were prepared for the new model were placed in ATPU units. (Peltzman, II-2). By January 2012, only 11 out of 96 residents in the ATPU units had complete evaluations. (Peltzman, II-3, 37).

Healey was placed in an ATPU unit; Given was placed in a Therapeutic Communities unit.

Under the new "good lives" model, the Treatment Center is utilizing a similar model for treatment as before: primary groups, specialty groups, and psychoeducational classes. It is unclear whether courses taken under the old model will be taken into consideration when considering a resident's progress. Psychoeducational classes have been retooled to focus on how

residents can address the 13 dynamic risk factors of the STABLE-2007 list.  Many social and community activities, which were discarded when FHS first took over sex offender treatment, are being reinstated.  In fact, Treatment Center staff asked residents to create lists of what activities and social gatherings they would like to see, and 77 percent of their requests were approved.  (Peltzman, II-3, 55).  Treatment Center staff is also working to create more incentives and privileges for residents who engage in treatment.  Currently, the housing units for residents who take part in treatment have their own refrigerator, microwave, washer and dryer, while the units for residents who refuse treatment do not. (Corsini, II-1, View).

## V. LEGAL STANDARDS

### A.   Legal Standards Under the Constitution

Plaintiffs Healey and Given seek a permanent injunction and declaratory judgment to address numerous alleged violations of the Amended Management Plan and U.S. Constitution regarding their conditions of confinement at the Treatment Center.

The Supreme Court has held that constitutional challenges to the conditions of civilly committed sexually dangerous persons are governed by the Due Process Clause of the Fourteenth Amendment.[6]  Seling v. Young, 531 U.S. 250, 265 (2001)(discussing

---

[6] Healey also asserts an Eighth Amendment claim but the First Circuit has held that "protection of civilly committed persons rests on due process concepts rather than the Eighth Amendment."

Washington state civil commitment statute for sexually violent
predators).  "[D]ue process requires that the conditions and
duration of confinement under the [commitment statute] bear some
reasonable relation to the purpose for which persons are
committed." Id.; see Battista v. Clarke, 645 F.3d 449, 452-53
(1st Cir. 2011)(applying due process analysis to claim of civilly
committed sex offender).  Civilly detained persons "are entitled
to more considerate treatment and conditions of confinement than
criminals whose conditions of confinement are designed to
punish." Youngberg v. Romeo, 457 U.S. 307, 324 (1982); cf. Block
v. Rutherford, 468 U.S. 576, 583 (1984) (in a case involving
pretrial detainees, holding "dispositive inquiry is whether the
challenged condition, practice, or policy constitutes
punishment.").

　　　The Supreme Court has recognized that "potentially
indefinite" incapacitation of the dangerously mentally ill may be
a legitimate purpose of a civil commitment law where individuals
have untreatable conditions.  Kansas v. Hendricks, 521 U.S. 346,
364-65 (1997)(emphasizing, though, that annual review proceedings

---

Battista v. Clarke, 645 F.3d 449, 452 (1st Cir. 2011).
Therefore, the court will analyze his claim under the 14th
Amendment, and dismiss his Eighth Amendment claim.  See, e.g.,
Fournier v. Corzine, 2007 U.S. Dist. LEXIS 54110, *4-5 n.2
(D.N.J. July 26, 2007)("Because Plaintiffs are civilly committed
persons and not convicted prisoners, the Eighth Amendment is not
applicable to them.  Therefore, all claims asserting an Eighth
Amendment violation will be dismissed accordingly.").

provide a procedural safeguard to ensure that commitment is only "potentially indefinite"). However, "the confinement's duration [must be] linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others." Id. at 363.

When analyzing whether DOC policies at the Treatment Center violate the Constitution, the Supreme Court recognizes that "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 539, 548 (1979). The First Circuit has noted that "an unsafe environment would be one in which the ability to deliver effective therapeutic services would be drastically reduced." Langton v. Johnston, 928 F.2d 1206, 1220 n.17 (1st Cir. 1991); see also id. at 1216 ("Because every patient [at the Treatment Center] is a convicted sex offender, and a majority of them have some kind of mental deficiency, the [DOC faces] legitimate security concerns"); Cameron v. Tomes, 990 F.2d 14, 21 (1st Cir. 1993)("In matters of security, as opposed to administrative convenience, the administrators' discretion is at its zenith . . .").

"States enjoy wide latitude in developing treatment regimens." Hendricks, 521 U.S. at 368. However, "a treatment

program that amounts to no treatment at all or departs
substantially from generally acceptable standards of treatment
cannot be reasonable related to the State's asserted interest in
providing [residents] with treatment and rehabilitation." Healey
v. Murphy, 2007 U.S. Dist. LEXIS 100060, at *57 (D. Mass. Nov.
14, 2007).  In assessing a challenge to inadequate treatment by a
civilly committed sex offender, the courts must determine
"whether the defendant failed to exercise a reasonable
professional judgment." Battista, 645 F.3d at 452.  While
decisions made by professionals are presumptively valid,
liability may be imposed when a decision involves a substantial
departure from accepted professional judgment, practice, or
standards.  See Youngberg, 457 U.S. at 323; see also Allen v.
Illinois, 478 U.S. 364, 373 (1986)(stating that if "the
confinement of [civilly committed sex offenders] imposes on them
a regimen which is essentially identical to that imposed upon
felons with no need for psychiatric care," petitioner could have
valid claim challenging conditions of confinement); West v.
Schwebke, 333 F.3d 745, 748 (7th Cir. 2003) (due process requires
that treatment decisions be based on professional judgment);
Fournier v. Corzine, 2007 U.S. Dist. LEXIS 54110, at *31-32
(D.N.J. 2007)("The Fourteenth Amendment Due Process Clause
requires state officials to provide civilly committed persons,
such as [persons committed pursuant to sexually dangerous persons

32

statutes], with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined.").

Under Chapter 123A, residents are committed to the Treatment Center for the purpose of "care, custody, treatment and rehabilitation."  Mass. Gen. Laws ch. 123A, § 2.  Therefore, to prevail on their constitutional claims, plaintiffs must prove that the conditions at the Center are not reasonably related to the care, custody, treatment and rehabilitation of the residents.

**B.**     **The Plan**

Healey also alleges that the DOC defendants have violated the Amended Management Plan.  (Healey, Count I).  The Plan imposes higher standards than required by the Constitution.  See Langton, 928 F.2d at 1217-18 ("Least restrictive conditions of confinement" standard found in the Plan sets "a higher standard than the Constitution.").  In earlier proceedings, Judge Gertner determined that the Plan constitutes an enforceable court order. See Doc. No. 275 at 37 ("Because the District Court incorporated the Plan into its ruling on the motion to terminate the consent decrees, the Plan remains enforceable.")(Gertner, J., adopting report and recommendation of Dein, J.); see also id. at 36-37 ("[T]he Plan 'is an enforceable operating document [and] residents may bring an action to enforce the terms of the existing Plan.'")(quoting King IV, 53 F. Supp. 2d at 137).

Although defendants press their objection to this prior ruling, this is the law of the case.

While Judge Mazzone referred to the Plan as the "governing document[] for the Treatment Center," King IV, 53 F. Supp. 2d at 122, the Plan provides for a certain amount of operational discretion to take into account the changing environment of sex offender treatment in Massachusetts.  See Ex. 1 at 48. Defendants request the Court take into account this flexibility when determining whether they have violated specific provisions of the Plan.  Specifically, they request the Court consider two events at the Treatment Center that have significantly affected operation since the 1996 Plan was adopted: the reinstatement of civil commitments in September 1999 and the Massachusetts Superior Court's ruling in 2001 which entered a declaratory judgment that the state statute required residents and criminal inmates at the Treatment Center be held "separate and apart" at all times (although the court declined to issue an injunction). See Durfee v. Maloney, 2001 WL 810385, at *15.

These events have resulted in an increase in population of residents and a decrease in time and space in which they can participate in activities.  For example, because they can no longer share common facilities--such as the dining hall, library, gym, and classrooms--with criminal inmates, the time residents are able to use these facilities has essentially been cut in

34

half.  Moreover, while only 177 residents were housed at the
Treatment Center when the consent decrees were terminated in June
1999, see King IV, 53 F. Supp. 2d at 125, as of October 2011, the
Treatment Center housed 245 residents and 81 individuals pending
resolution of their commitment petitions.  Defendants contend
that the Plan was premised on the assumption that the resident
population would gradually decline as they are released pursuant
to section 9 proceedings or die because new civil commitments had
been abolished in 1990.  Id. at 122, 125.

Plaintiffs counter that the DOC must follow the Plan
regardless of these changes.  They argue that it was the DOC's
own decision to respond to the "separate and apart" policy by
keeping criminal inmates at the Treatment Center and divide the
residents' time in common facilities in half.  They contend that
the DOC could have sought funding to build another prison for
criminal inmates, built addition facilities at the Treatment
Center, or moved criminal inmates to other prisons that offer sex
offender treatment, such as Norfolk and Gardner. See (Maloney,
I-5, 140-42; Murphy, I-5, 15-16); Ex. 592, at 46-47.

## VI.  THE CLAIMS

### A.  Pharmacological Treatment

Plaintiffs contend that defendants have failed to provide
adequate pharmacological treatment in violation of their
Fourteenth Amendment due process rights.  Healey also claims the

35

failure to provide pharmacological treatment violates the Plan. The Plan requires the Treatment Center to provide "the best current treatment methodology."  Ex. 1 at 4.

Unlike its predecessor sex offender treatment provider, JRI, FHS has never provided psychopharmacological treatment, whether SSRIs or anti-androgens, to treat paraphilic disorders.  FHS's contract to provide sex offender treatment at the Center does not contain a pharmacological component, and FHS does not have a psychiatrist on staff or anyone else qualified to prescribe drug therapies. (Lyman, I-8).  FHS staff consists primarily of psychologists, therapists, and social workers.

The Treatment Center's contracts with MHM, covering mental health services, and the University of Massachusetts Medical School ("UMass Medical"), covering medical services, do contain a pharmacological component.  Specifically, the contracts state: "The contractor shall work cooperatively with the sex offender vendor [FHS] and the Community Access Board . . . to evaluate referrals for . . . psychopharmacological treatments for deviant sexual behavior.  All referrals shall be responded to with a detailed written report." Ex. 7-A (Sec. 8.3.18).  Information regarding pharmacological treatment has not been made available to residents, no resident has been evaluated to receive drug therapies, and MHM and UMass Medical have not prescribed any at the Treatment Center.  (Corsini, I-5; Spencer, I-6; Murphy, I-4).

36

Moreover, no one at FHS has made a referral to MHM or UMass Medical to evaluate a resident for pharmacological treatment, and no FHS staff member is even qualified to make such a referral. (Lyman I-8; Spencer, I-6).

In January 2012, just days before the second trial commenced in this case, DOC and MHM staff met for the first time to develop protocols to provide pharmacological treatment to residents at the Treatment Center. Lawrence Weiner, Assistant Deputy Commissioner of Clinical Services for the DOC, consulted with Niklos Tomich, Chairperson of the Community Access Board, Joe Andrade, Director of Clinical Programs for MHM, and Robert Deiner, Psychiatric Director for MHM, to create the protocols. (Weiner, II-6). At trial, DOC and MHM staff testified that they planned to institute the protocols as soon as possible, and hoped to fully roll out the new pharmacological treatment program by the end of February 2012. Treatment Center staff also said they plan to inform residents of the protocols through postings in housing units and speaking to residents directly at community meetings. (Weiner, II-6). However, at oral argument on March 1, 2012, DOC counsel informed the court that the protocols had not been finalized. The court has received no supplementation with respect to the protocols.

The plaintiffs rely on expert testimony from Dr. Fabian Saleh in support of their request for pharmacological treatment

when treating sex offenders.  Dr. Saleh, founding director of the Sexual Behaviors Clinic in Worcester, Massachusetts where he treats paraphilic sex offenders, testified that both plaintiffs are candidates for pharmacological treatment.  In his view, pharmacological treatment is an accepted practice for psychiatrists to consider together with talk therapy when treating their patients' paraphilic disorders.  Patients who suffer from paraphilic disorders have a history of recurrent deviant sexual thoughts, fantasies, or behaviors, causing distress or impairment.  (Saleh, I-6, 86, 94-95); Ex. 615 at 46; Ex. 620.  Psychiatrists prescribe anti-depressants like Selective Serotonin Reuptake Inhibitors (SSRIs), anti-androgens, and other testosterone-lowering hormone drug therapies to treat some sex offenders "who present with intense sexual urges or cravings for paraphilic activity." (Saleh, I-6, 132).  However, the drugs might not work for all patients and can have undesirable side effects.  See Ex. 634 at 1.  The drugs are especially appropriate for patients who are not receptive or amenable to talk therapy. (Saleh, I-6, 80).

Dr. Saleh's salient point is that the treatment regime offered by the Treatment Center is inconsistent with the requirements of the Plan because it does not reflect the best current treatment methodology in that it does not include a pharmacological component for treatment of paraphilia.  It is a

38

standard best practice for psychiatrists to evaluate each patient individually to determine whether pharmacological treatment would help.  According to Saleh, "the success rate is rather high" for treating sex offenders with anti-androgen drug therapy "[i]f you look at success as being [the reduction of] recidivism rates." (Saleh, I-6, 82-83).  Because the Treatment Center has not provided any pharmacological treatment to residents, Saleh rendered the opinion that it has not provided sex offender treatment to Given and Healey using the best current methodology (Saleh, I-6).

The DOC has not introduced any expert testimony or literature rebutting Saleh's expert opinion.  Indeed, it states it does not oppose having plaintiffs evaluated by a psychiatrist for pharmacological treatment; during trial it actually offered to have plaintiffs evaluated.  Defendants recognize the importance of drug therapy in treating paraphilic disorders. Although the provisions have never been utilized, as stated earlier, the Treatment Center's own contracts with mental health and medical services provide for referrals for "psychopharmacological treatments for deviant sexual behavior." Ex. 7-A (Sec. 8.3.18).

Although these drugs are not approved by the Food and Drug

Administration ("FDA") to treat sexual deviancies,[7] the Sex
Offender Committee of the American Academy of Psychiatry and the
Law ("AAPL") and the Association for the Treatment of Sexual
Abusers ("ATSA") both recommend pharmacological drug
interventions for some sex offenders as a best practice for
psychiatrists when treating their patients' paraphilic disorders.
Ex. 615 at 46; Ex. 619; (Saleh, I-6, 86).

        This form of drug therapy is a treatment option utilized by
the Federal Bureau of Prison's ("BOP") Sex Offender Treatment
Program at FCI Butner, North Carolina.  Ex. 634 at 1.  The BOP
established protocols for providing pharmacological treatment to
sex offenders in October 2005, after it found that
"[p]harmacotherapy of sexual offenders has been shown to be at
least partially effective in reducing relapse in some men
diagnosed with paraphilias."  Id.; see also United States
Sentencing Commission, Federal Child Pornography Offenses 280-81
(2012)(stating that professional treatment for sex offenders may
include prescribing SSRIs and anti-androgenic medication).  The
federal protocols establish an eight-step process when
administering drug therapy: (1) patient selection, (2)
evaluation, (3) medication selection, (4) informed consent, (5)

---

        [7]  Although drug companies are prohibited from marketing
drugs for "off-label" uses not approved by the FDA, doctors are
allowed to prescribe drugs off-label.  See In re Neurontin Mktg.
& Sale Practices Litig., 244 F.R.D. 89, 92 (D. Mass. 2007).

Central Office approval, (6) institution of treatment, (7) monitoring during treatment, and (8) release planning.  Id. at 2. As part of the evaluation process, all individuals must undergo a thorough psychiatric evaluation, and a psychiatrist determines whether an individual is eligible for pharmacological treatment. Id. at 3-4.

Both Healey and Given testified they have made requests to their treatment providers and DOC staff to be evaluated for pharmacological treatment.  Healey testified he made a request to his psychiatrist Dr. Bauermeister in the mid-1990s (Healey, II-1, 140).  Although Healey has not generally been a credible reporter of events, his therapist Angela Orlandi confirmed that Healey also discussed pharmacological treatment with her in October 2010. (Orlandi, I-10, 71).  In December 2011, Healey wrote a letter to Mental Health Director Tiana Bennett asking to be evaluated for pharmacological therapy.  Ex. 604.

Given says he made a request for drug therapy to then-clinical director Dr. Rodrigues around 2004. (Given, I-4, 75-78). He also made requests to his therapist Iris Hailey and the current clinical director Noi Prete in 2011. (Given, II-2, 124-25).  Treatment Center staff never referred their requests to medical staff, and instead informed Healey and Given that pharmacological treatment was not available. (Orlandi, I-10, 73-74; Healey, II-1, I-3; Given, II-2, 125).  Indeed, since FHS has

41

taken control of treatment, no resident has been evaluated to determine whether he would be an appropriate candidate for drug therapy.  (Murphy, I-4, 121; Corsini, I-5, 158).

Both plaintiffs want pharmacological treatment to help them address their pedophilia.  Dr. Saleh interviewed them both briefly at the Treatment Center and reviewed their records. (Saleh, I-6, 63).  Healey wants to be evaluated for drug therapies because he has been doing cognitive behavioral therapy for 48 years, and it hasn't worked.  (Healey, II-1).  Dr. Saleh opined that it is useless to continue providing only cognitive behavioral therapy when it has failed for such a long time. (Saleh, I-6).  Saleh states that Healey's multiple mental illnesses--Attention Deficit Hyperactivity Disorder, limited cognition, Schizoaffective disorder, bipolar disorder, depression, and Klinefelter's syndrome--are a main reason why cognitive behavioral therapy has failed, and why pharmacological treatment is needed.[8]  (Saleh, I-6, 68-69).  Based on the court's observations of Healey at trial and hearing his testimony, I agree that he has significant cognitive limitations and continuing sexual deviant thoughts.

Regarding Given, Saleh testified that his diagnosis of

---

[8] Defendants claim that Healey lacks standing to challenge the lack of pharmacological treatment.  However, Healey has standing because he is seeking drug therapy which Dr. Saleh says he is suitable for.

pedophilia suggests the need for pharmacotherapy because cognitive behavioral therapy treatment has been ineffective for ten years. (Saleh, I-6).  Saleh adds that even though Given may sometimes deny having sexual deviant thoughts, he would still recommend Given for pharmacological treatment.  Saleh looks at "the totality of the data," and "if the data at [his] disposition suggests that the person presents with a paraphilic disorder, that they have offended in the context of the paraphilic disorder, they may not be symptomatic at this point in time for a number of different reasons, [he] still may make [a] recommendation" for pharmacotherapy.  (Saleh, I-6, 142:13-19).

Certain DOC and FHS staff have expressed reservations about providing medication to treat residents' paraphilic disorders. Their main concern appears to be that residents may take the drug therapies to reduce their sexual deviant behavior while detained at the Treatment Center, leading to release into the community under the section 9 process.  At that point, when they are released from the Treatment Center, defendants worry residents may stop taking the medication, causing them to relapse and commit new sexual offenses against children.  (Corsini, II-3; Tomich, II-4).  This concern is understandable because the state's civil commitment release process for residents does not provide for any supervised release where probation or parole officers can monitor pharmacological treatment after a resident

43

is released from custody.  Compare Mass. Gen. Laws ch. 123A, with
18 U.S.C. § 3583(k) & U.S.S.G. § 5D1.2(b)(recommending lifetime
term of supervised release for all individuals convicted of
federal sex offenses); see also United States Sentencing
Commission, Federal Child Pornography Offenses 283 (2012)("It is
widely accepted among treatment providers that prison treatment
will be more effective if it is followed by community-based
containment services, including supervision, treatment, and
polygraph testing")(internal quotations omitted).  As will be
seen below, the section 9 process has been the sole means of
releasing residents into the community because no residents have
been released under the supervision of the community access
program.  Defendants argue that there is no need to use
pharmacological treatment to control behavior while the person is
within the secure confines of the Treatment Center.  This
argument misses the point.  The provision of adequate
psychopharmacological treatment may well result in more residents
being eligible for acceptance into the Community Transition House
and community access program, as required by the Plan and state
statute.  See infra pp. 46-48.  If so, residents may be monitored
when released during the community access program to ensure they
continue to take the drugs.

     The Court concludes that defendants' failure to evaluate
Healey and Given for pharmacological treatment using

professionally acceptable standards violates the Plan because plaintiffs are not being provided "the best current treatment methodology." Ex. 1 at 4. Defendants also violate the Due Process Clause of the Fourteenth Amendment because they have failed to exercise a reasonable professional judgment by not providing psychological evaluations to determine whether drug therapy is appropriate.

**B.   The Community Access Program and Community Transition House**

**1. The Community Access Program**

Plaintiffs argue that defendants have violated the Constitution, the Plan and state law by failing to provide a functioning community access program. They also contend that the Treatment Center has not provided adequate access to the Community Transition House ("CTH"), a lower-security housing area which is the first step in achieving acceptance into the community access program.

The civil commitment statute expressly requires the establishment of a community access program "that provides for a person's reintegration into the community." Mass. Gen. Laws ch. 123A § 1; see id. § 6A. In the King litigation, the district court stated that "[a] community access program is indispensable in a treatment program." King IV, 53 F. Supp. 2d at 132. At the time of the consent decree litigation, both the First Circuit and the district court determined that the community access program

was acceptable.  At that time, however, residents raised concerns that there were only 12 men in the CTH and participants in the program had shrunk from 56 in 1988 to two in 1997.  See King, 149 F.3d 9, 16 (1st Cir. 1998).  The First Circuit stated that "at this juncture . . . [t]his does not . . . point to any obvious constitutional failure.  Further adjudication will have to await events."  Id. at 17.  Judge Mazzone added that the community access program "needs attention in such a way as to encourage and facilitate greater participation in the program so that residents receive the benefit of the program before being released to the public."  King IV, 53 F. Supp. 2d at 135-36.  Since 1998, the program has had zero participants.

   a.   The Plan[9]

   The Amended Management Plan requires a "system of differing levels of security and privileges in order that residents can be

---

[9] Although Judge Mazzone's order held that the Plan was the Treatment Center's governing document, since 1999, DOC has considered another policy, titled "Transition Program," to be the operating document for purposes of the community access program. (Murphy, I-4, 86-88); Ex. 325, App. 20; Ex. 27A.  This Transition Program was submitted to the Massachusetts Legislature in December 1999 in response to Mass. Gen. Laws ch. 123A § 16, which states that "[t]he treatment center shall submit on or before December 12, 1999 its plan for the administration and management of the treatment center to [the legislature]."  While the two policies are similar, the Transition Program is 30 pages shorter than the policy in the Amended Management Plan and does not include the detailed description of available programs and reintegration release activities.  Compare Ex. 1, App. 16 at 17-35, with Ex. 27A.  The Court considers the Amended Management Plan to be the legally operative document.

maintained in the 'least restrictive conditions' of confinement."
Ex. 1 at 6.  It establishes a three-level privilege system "to
differentiate among levels of programmatic involvement and reward
success in meeting program treatment and behavioral goals."  Id.
at 34.  As the final step of the system of differing levels of
privilege, the Plan calls for "a properly structured community
access program [to] serve as the final source of data collection
for those ultimately making discharge recommendations."  Id. at
44.  Thus, "the community access program must be multi-level,
with independent evaluations and assessment at each and every
stage of progress . . . to serve the treatment needs of residents
and to provide for the safety of the community."  Id.  Once
accepted, residents can participate in a variety of release
activities in the community, including therapeutic services,
vocational and education classes, employment opportunities,
health services, religious services, legal visits, and purchasing
items/services necessary for participation in education or
employment programs (getting hair cuts, shopping for clothes,
purchasing a car, getting a driver's license, etc.).  Id. App. 16
at 22-27.  To be eligible for the community access program, a
resident has to be subject to a civil commitment only with no
remaining criminal sentences pending in any jurisdiction.  Id.
App. 16 at 5.

    To apply, an eligible resident files an application with his

treatment team.  The Unit Director then assigns the resident to a
Transition Group of staff and group members, who help him develop
his own Transition Plan.  Id. App. 16 at 7.  The Transition Plan
must address the following five areas: (1) vocation or education,
(2) community support, (3) outpatient treatment, (4) family
access, and (5) relapse prevention.  Id. App. 16 at 5-7.  After
completing the Transition Plan, the resident presents it first to
his primary group for feedback, and then to his treatment team
for approval.  Id. App. 16 at 7-8.  If the application is denied
by the treatment team, the resident may modify it or appeal the
decision to the program administrative team.  Id. App. 16 at 8.
If the treatment team approves the application, it is forwarded
to a classification review committee, and if approved by them, is
forwarded to the CAB.  Id. App. 16 at 8-9.  If approved by the
CAB, the application is sent to the Superintendent, along with a
report signed by the CAB explaining its decision.  The
Superintendent issues a written decision, and forwards it to the
Assistant Deputy Commissioner of the Bridgewater Complex for
final approval.  Id. App. 16 at 9-10.  According to the Plan, the
entire process should take less than seven months in total.  Id.
App. 16 at 11.

Under the Plan, the resident begins his community access
program once he is transferred to the CTH.  Id. App. 16 at 13.
Residents apply separately to the CTH.  CTH applications are

48

presented to the Biannual Review of Treatment ("BART") Board--
comprising of the Program Director, Clinical Director, and
representatives of Rehabilitation and Health Services--for
approval, and then forwarded to the Superintendent for final
approval.  Id. at 16; see also infra pp. 53-54.  The house has
two security levels, minimum security and pre-release.
Eligibility to move to pre-release status is based on completing
required programming, assessment from CTH staff, and absence of
any major incident reports.

The community access program has four phases: (I)
orientation: minimum security, (II) transition: pre-release,
(III) integration: pre-release, and (IV) reintegration: pre-
release.  Id. App. 16 at 14-17.  Phase I should last for at least
six months, and consists of the regular programming for residents
of the transition house.  After the first two months of Phase I,
residents are permitted to leave the Treatment Center and
participate in release activities.  Id. App. 16 at 14.  In Phase
II, lasting at least three months, residents are allowed more
time away from the CTH, with longer releases and more variety of
activities, including work assignments outside of the Treatment
Center.  Id. App. 16 at 15.  In Phase III, lasting at least
another three months, the resident will have completed all in-
house programming and may be employed full-time outside of the
Treatment Center, or in an education or vocational program.  Id.

App. 16 at 16.  Finally, in Phase IV, also lasting at least three
months, the resident executes his plan for permanent
reintegration into the community, including outpatient therapy,
living accommodations, employment, and transportation.  Id. App.
16 at 17.

      *b.   DOC's Implementation of the Plan*

     Former DOC Commissioner Kathleen Dennehy recognized that the
DOC is required to provide a community access program at the
Treatment Center and considered it an integral part of the Plan.
(Dennehy, Ex. 585, at 67, 71).  Current Commissioner Luis Spencer
adds that the program is "important to the rehabilitation
process." (Spencer, I-6, 50).

     When JRI was providing sex offender treatment from 1992 to
2002, the community access program was functional for a short
time.  As part of the program, a few residents were permitted to
leave the facility to go on shopping trips and attend alcohol and
sexual treatment programs.  (Schwartz, I-2, 57); Connolly, Ex.
584 at 118; Ex. 553 at 3-4.  However, near the end of JRI's
tenure, residents who were applying for the program stopped being
approved.  (Schwartz, I-2, 58-59).  By 1997, only two residents
were participating in the program; one was released in February
1998 and the other was suspended from the program in February
1997 after Treatment Center staff received information that a
previously unknown victim reported that the resident had sexually

assaulted the victim as a child.  Ex. 553 at 4.  Since then, no resident has participated in the program.  Exs. 553, 554; (Lyman II-5, 7-8).

When FHS took charge of sex offender treatment in 2002, its contract with the DOC confirmed that FHS would develop a program to meet the legally-required need to provide community access to residents.  However, the community access program has been nonexistent since FHS took over.  No one has participated in the program, and the CAB has not received a single application to review.  Ex. 343 at 5-6; (Tomich, I-7, 146).  Within the past year, three residents have begun the process of completing applications to the community access program, but Treatment Center staff acknowledge that they likely will be released before their applications are approved.  (Lyman, I-8, 77; II-5, 48-50).  In January 2009, then-Superintendent Murphy issued a memo to the DOC confirming that while the community access program "will remain in effect at this time . . . [it] is currently being reviewed and significant language changes are anticipated."  Ex. 27A at 1.  However, to date, no changes have been made to the policy.  (Murphy, I-4, 106; Corsini, II-4, 123).

## 2.   The Community Transition House (CTH)

The CTH is a lower-security housing area for residents who have progressed in their treatment.  The goal of the placement is to help transition them into a residential environment closer to

eventual release into the community.  In contrast to the
Treatment Center, which feels and looks like a stark, sterile,
medium-security prison, inside, the CTH feels and looks like a
residential house.  However, outside, it is surrounded by a
barbed-wire fence and is confined within the Treatment Center's
border security fence.

Residents are eligible for the CTH if they "are not deemed a
security risk by the Director of Security" and "have completed a
substantial percentage of their treatment goals, as determined by
the Clinical Director in consultation with the residents'
treatment teams."  Ex. 1 at 16.

Residents in the CTH have more privileges than those within
the facility.  The common room contains a flat-screen television,
a stereo system, and bookshelves with therapeutic and
entertainment books.  The CTH also has a computer lab, consisting
of three computers for word processing and a printer.  CTH
residents have access to a vegetable and flower garden and gym
equipment in the basement.  They have the option of eating meals
within the facility or at the house, where the kitchen includes a
refrigerator, freezer, electric stove, microwave, and toaster.
In addition to ordering food from the staff canteen, they can
purchase various items, including food and clothes, from outside
the facility.

Residents must continue to undergo sex offender treatment

while residing at the CTH, which includes special intensive
programming at the CTH itself in addition to continued
participation in treatment at the facility.  Security staff is
also present at the CTH at all times, and all CTH windows have
metal bars on them.  Residents at the CTH may be moved back into
the facility for failing to continue treatment or for security or
behavioral infractions.

In order to get into the CTH, a resident must first complete
an application and submit it to his treatment team.  See Ex. 613
(CTH application).  If approved by the treatment team, the
application then must be approved in stages by the Treatment
Review Panel and DOC administrators, including final approval by
the Superintendent.  (Peltzman, II-4, 40-41; Lyman, I-8, 86).
There is no formalized appeals process if a resident is denied
for placement in the CTH at any step in the process. (Peltzman,
II-4, 40-41).

The CTH was officially closed for five years from October
2003 until November 2008 following the escape of a resident.  SF
¶ 32.  During this time, the DOC made no effort to seek out
alternative living arrangements for residents who were qualified
to live in the CTH.  (Murphy, I-5).  The CTH was closed again for
three weeks in 2010 because the DOC did not allocate enough money
in its budget to maintain the CTH at the end of the fiscal year.
(Luongo, I-10, 96).

From November 2008 through the January 2012 trial, only ten men out of approximately 44 eligible residents who applied were accepted to live in the CTH.  (Lyman, II-5, 7-8).  Moreover, at least three times the Superintendent has denied placement in the CTH, overruling both the resident's treatment team and the Treatment Review Panel.  No reason was indicated for these denials.  See Ex. 612 at 1-2; (Corsini, II-4, 80-82).

When I visited the Treatment Center in January 2012, only three men were living at the CTH.  Regarding the seven others accepted in the CTH, one resident had been returned to the main facility after assaulting an officer, and the other six had been released into the community through the section 9 process.  (Lyman, II-5, 9).  While the CTH has capacity for 12 residents, it has never had more than five at one time residing in the house.  (Lyman, II-4).  Yet, FHS staff recognize that if the sex offender program were running "optimally," the CTH would be at full capacity.  (Peltzman, II-3, 129).  The Plan contemplated an ideal capacity of 18 residents, a goal that has never come close to being realized.

Why has the CTH been so underutilized?  FHS staff attribute the CTH's low occupancy rate to two factors.  Some residents choose not to apply because they do not want to leave their friends inside the main facility, while others do not want to commit to CTH's intensive treatment program.  (Lyman, II-4, 144-

54

45).  Plaintiffs argue that they and other residents do want to reside in the CTH, but the lack of clear prerequisites and a cumbersome application process make it extremely difficult to gain acceptance into the CTH.  (Given, II-2, 122).

Defendants have presented no evidence of guidelines outlining what courses residents must complete or any other benchmarks that would make them suitable for the CTH.  The most recent evaluations FHS staff have been conducting under the new "good lives" model do not assess whether a resident would be suitable for the CTH.  (Peltzman, II-2, 223-24).  The only reasons that would make residents automatically ineligible for the CTH is if they had a pending criminal sentence or immigration detainer,[10] or if they had received discipline within the past year.

Both plaintiffs have applied to live in the CTH.  Given applied in 2008.  Although Given was not told of any prerequisites when applying to the CTH, his application was denied by his treatment team because he had not completed his "deviant cycle," a program under the former relapse prevention model.  The "deviant cycle" was a time-intensive program where a resident writes about and discusses with his primary group his

_____

[10] An immigration detainer is issued to a state or local prison by U.S. Immigration and Customs Enforcement when the agency is seeking custody of an individual in that facility for purposes of instituting removal proceedings.

recurring patterns of behavior that make him prone to inappropriate and criminal behavior. (Given, I-4, 50-51; II-2, 108). Before completing the assignment, a resident must present his "deviant cycle" to his primary group and treatment team multiple times and make changes based on their feedback. (Given, II-2, 111). Given recently finished his "deviant cycle" task, but, as of the January 2012 trial, had not yet reapplied to the CTH because he had not received the new application form. (Given, II-2, 109, 113).

With the changes under the "good lives" model, completion of the "deviant cycle" is no longer a requirement for the CTH. (Lyman, II-4, 141); (Peltzman, II-3, 122-24). Under the "good lives" model, it is unclear what benchmarks have to be met to get into the CTH. (Id.)

Healey has applied to the CTH many times. In 1996, when JRI managed the sex offender program, Healey lived in the CTH for about one year. (Healey, I-3, 55). He was ordered back to the main facility after he threw a television out of a window. More recently, Healey applied to the CTH in 2009. He was initially approved by his treatment team, but the approval was rescinded about one month later due to behavioral issues. (Orlandi, I-10; Ex. 612). Healey last applied in 2010, and his application was denied. (Healey, I-3, 54, 98-99); (Lyman, I-8, 84).

### 3.   Barriers to Entry into the Community Access Program

One reason why residents have not applied to and have not been admitted in the community access program is that it is easier to be released from the Treatment Center entirely through the section 9 process than be admitted in the community access program. (Tomich, I-7, 148). Some residents have been granted release through the section 9 process while in the process of completing their applications to the program. (Tomich, I-7, 148-49). None of the approximately 50 residents who were adjudicated under the section 9 process to be no longer sexually dangerous from 2008 to June 2011 participated in the community access program while awaiting discharge from the Treatment Center. See Ex. 554 at 2. Therefore, although the community access program is the final step in treatment envisioned by state statute and the Plan, not a single individual has ever successfully completed the sex offender treatment program. As a result, sex offenders are leaving the Treatment Center without any program to help them transition back into society and without any effective supervision to protect society once they are released, contrary to the intent of the Plan and statute.[11]

---

[11] The federal government and many states have statutes that provide for supervised release for sex offenders after being released from civil commitment. See, e.g., 18 U.S.C. § 3583(k) & U.S.S.G. § 5D1.2(b) (recommending lifetime term of supervised release for all individuals convicted of federal sex offenses); Wisc. Stat. 980.08(4)(cg) (when granting conditional release, permitting court to consider "what arrangements are available to ensure that the person has access to and will participate in necessary treatment, including pharmacological treatment"); Ill.

A major reason why it is so difficult to gain admission into the community access program is the lengthy and difficult application process.  A resident begins working on his community access program application only once he has been accepted into the CTH.  As seen above, the application process to get into the CTH is itself cumbersome and entry is difficult to achieve because standards for applying are unclear.  The process takes a long time, and success is unlikely.  Moreover, because the CTH was closed for five years and on subsequent occasions for budget issues, the pipeline to the community access program via the CTH dried to a trickle.

Moreover, once in the CTH, another application process is required.  The application requires residents to outline what they would like to do when outside of the facility and where they would like to attend classes or learn a skill or trade.  They must also identify an outside treatment provider to attend sex offender therapy.  (Lyman, II-5, 20).  This process can take up to a year.  The three residents who were working on their applications in July 2011 were still working on them during the January 2012, and, at that time, Treatment Center staff expected they needed an additional two and a half months before the

---

Comp. Stat. Ann. Ch. 725, § 207/40(b)(5)(F) (stating that released civil committee shall "attend and fully participate in assessment, treatment, and behavior monitoring including, but not limited to, medical psychological or psychiatric treatment specific to sexual offending . . . .").

applications would be approved.  (Lyman, II-5, 48).  The
applications must receive approval at multiple levels, including
from the treatment team, treatment provider, CAB, and ultimately,
the Superintendent, who has final approval authority.  Once they
receive the applications, both the CAB and Superintendent have 30
days to review them and respond.  (Lyman, II-5, 48).

     The last time the CAB received any applications was in 2001.
At that time, the CAB received two applications.  It denied one
and deferred action on the other because the applicant had not
secured approval from the treatment provider's reviewing board
before he submitted the application to the CAB.  See Ex. 343 at
5-6.  Neither resident reapplied, and both were found no longer
sexually dangerous and released within two years.  Id.  At trial,
CAB Chairperson Niklos Tomich received feedback that residents
prefer to seek release through the section 9 process and agreed
the application process for the community access program was
"tedious" and more difficult for residents than simply waiting to
be released through the section 9 process.  (Tomich, II-5, 146).

     Although DOC and FHS staff recognize the problem of not
having a functioning community access program, they have done
very little to address the issue.  DOC Commissioner Spencer has
not enacted any policies or procedures to reinvigorate the
program.  (Spencer, I-6, 50, 53-54).  The DOC has not allocated
any staff or funds to supervise residents who may eventually gain

admission to the program, and Superintendent Corsini admitted that the Treatment Center may not even have the resources necessary to implement a community access program. (Corsini, II-4, 121-22; Murphy, I-4, 92). Residents are not provided any written information regarding the program at all. (Peltzman, II-3, 131). Although FHS agreed in its 2002 contract with the DOC to develop a viable community access program, at the January 2012 trial, Director of Assessment Brooke Peltzman conceded that "we're still in the stage of encouraging residents to apply." (Peltzman, II-3, 131); see (Lyman, II-5, 19).

FHS Program Director Kim Lyman was not aware that the Plan permits any treatment staff member to submit a community access program application on a resident's behalf to the Treatment Team for review. (Lyman, I-8, 85); see Ex. 1, App. 16, at 5. However, since FHS took over sex offender treatment, it does not appear that any treatment staff member has ever submitted an application on behalf of a resident. Why have defendants made no serious efforts to implement a community access program? Superintendent Corsini, who has the ultimate say regarding who is accepted into the community access program, admitted he fears that residents placed in the program would reoffend in the community. (Corsini, II-4, 120). The section 9 process shifts this burden from his shoulders to the courts.

### 4. Standing

60

As a threshold matter, the DOC contends that Healey and Given do not have standing to challenge inadequacies with the Community Transition House and community access program because they are ineligible to participate.  With respect to Healey, they claim his own bad conduct strips him of eligibility.  With respect to Given, they claim he has not met the program's requirements.  To satisfy the standing requirement under Article III of the Constitution, a plaintiff must assert (1) an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the above injury and a defendant's conduct; and (3) a likelihood that judicial relief will redress the above injury.  Libertad v. Welch, 53 F.3d 428, 436 (1st Cir. 1995) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-61 (1992)).

Causation requires injury that is "fairly traceable to the challenged action."  Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1147 (2013)(internal quotations omitted); see Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 346 (2d Cir. 2009)("[F]or purposes of satisfying Article III's causation requirement, we are concerned with something less than the concept of proximate cause.") (internal citation omitted).  The causal chain can be broken where a plaintiff's self-inflicted injury results from his "unreasonable decision . . . to bring about a harm that he knew to be avoidable."  St. Pierre v. Dyer, 208 F.3d 394, 403 (2d Cir.

2000); see Clapper, 133 S. Ct. at 1152 (holding plaintiffs do not have standing because their "self-inflicted injuries are not fairly traceable" to allegedly unlawful conduct).  However, "[s]tanding is not defeated merely because the plaintiff has in some sense contributed to his own injury. . . . Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain." 13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3531.5, at 361-62 (3d ed. 2008); see also Gulf States Reorganization Group, Inc. v. Nucor Corp., 466 F.3d 961, 965 (11th Cir. 2006)("[T]he mere fact that the [plaintiff's] own decisions played a role in its [injury] does not obviate the causal connection between the defendants' conduct and the plaintiff's injury.").

Defendants argue that Healey and Given do not have standing because they are not eligible for participation in the CTH and community access program due to their behavior and limited participation in treatment.  In effect, the DOC is arguing that there is no causal connection between their injury and the DOC's conduct because plaintiffs' failure to gain admission to the CTH and community access program is entirely their own doing.

Under defendants' rationale, no resident would have standing to challenge the defunct community access program, because, to date, no one has met the program's stringent criteria and been

admitted into the program.  Plaintiffs contend that the high
barriers to enter the CTH and community access program make it
practically impossible for them to meet the criteria to
participate in these programs that are supposed to be provided to
them under both the Amended Management Plan and Massachusetts
law.  Cf. Khodara Envtl., Inc. v. Blakey, 376 F.3d 187, 194 (3d
Cir. 2004)(stating that defendant conceptualized injury too
narrowly and finding that causation prong of standing "plainly
satisfied" when injury defined more broadly).

The standing issue for the Court to resolve is whether
plaintiffs' inability to gain admission to the CTH and community
access program is "so completely due to the plaintiff[s'] own
fault" or if it can be "fairly traceable" to inadequate sex
offender treatment and high barriers to entry.

Given has presented sufficient evidence to have standing.
His CTH application in 2008 was denied, at least in part, due to
a lack of clear benchmarks, as he was only told after-the-fact
that he needed to complete the "deviant cycle," which delayed his
admissions process four years.  Once he completed that program, a
new treatment model was created, which does not have clear
benchmarks for applying to the CTH nor explains how residents
would receive credit for their past work.  Although Given has
never applied to the community access program, his application
would have been futile because he has not gained entry into the

63

CTH.  See Nyquist v. Mauclet, 432 U.S. 1, 6 n.7 (1977)(finding
standing to challenge student loan application requirements even
though plaintiff had not applied for a loan, because he expressed
interest in applying and defendant conceded his application would
be rejected); Bach v. Pataki, 408 F.3d 75, 82-83 (2d Cir.
2005)(finding standing to challenge statute restricting issuance
of a concealed-weapon permit even though plaintiff failed to
apply for a permit, because his application would have been
futile).

Defendants' argument has greater merit with respect to
Healey.  Healy has had consistently problematic behavior in the
institution, and when he gained admission in the CTH, he was
thrown out for bad behavior.  However, Healey argues that if he
had received appropriate pharmacological treatment and better
talk therapy over his 48 years at the Treatment Center, he would
have become eligible if the barriers to entry were not so high.
Based on Dr. Saleh's uncontroverted expert testimony regarding
the futility of Healey's past treatment, the Court finds Healey
has standing as well.  See Dyer, 208 F.3d at 402 ("'So long as
the defendants have engaged in conduct that may have contributed
to causing the injury, it would be better to recognize standing .
. . .'") (quoting 13 C. Wright, A. Miller, & E. Cooper, Federal
Practice and Procedure § 3531.5, at 461 (2d ed. 1984)); cf.
Becker v. FEC, 230 F.3d 381, 388 (1st Cir. 2000)(finding that

plaintiff had standing after rejecting defendant's claim that his injury was "self-imposed").

Whether the alleged problems with the CTH and community access program have more to do with the plaintiffs' inadequacies or problems with treatment and admission criteria "is a matter more properly viewed as going to the merits rather than to standing." Dyer, 208 F.3d at 403.

### 5.   The Claims

Based on the record, I find that plaintiffs have proven that there is no functioning community access program at the Treatment Center in contravention of the statute and the Plan.  The evidence is straightforward.  There have been no participants since 1998.  As of the time of trial, no staff or budget was allocated to the program.  The application process is long, complicated and tedious with near certainty of failure.  One of the first barriers to entry is the difficulty in gaining access to the CTH, which, in January 2012, had only three members.  The CTH was closed for five years in clear contravention of the Plan, and has been closed more recently due to budgetary constraints. As mentioned, placement in the CTH is the necessary first step to gain access to the community placement program so closing the CTH dooms the community access program.  The application process to get into the CTH is itself cumbersome.

Plaintiffs also contend the failure to provide a functioning

community access program is a due process violation.  The DOC
admits that the community access program is a critical part of
the rehabilitation process, and has never argued that the
elimination of the program was related to the statutory purposes
of civil confinement: care, custody, treatment or rehabilitation.
Rather, DOC insists that its application process is reasonable,
and that residents are not applying because they would rather
stay in the main facility with their friends.  While this
explanation might be true for some residents, I find it's more
likely that the DOC has made the application process so opaque,
difficult and daunting, with such a likelihood of failure, so
that residents with a chance of success simply choose the section
9 route.

At the same time, the plaintiffs have not explained why a
functioning community access program is constitutionally
required.  They point out that, as of 2008, 16 of 21 states that
have enacted civil commitment laws for sexually dangerous persons
have provisions in their statutes that permit community access
prior to release.  Ex. 618 at 21.  However, they cite no caselaw
and have submitted no expert testimony or professional standards
stating that civilly committed sex offenders must have a
community access program.  Nor have they explained why a
meaningful treatment program using the "good lives" model of
therapy, see infra pp. 70-71, combined with the section 9 release

process is not constitutionally sufficient.  Accordingly, I
conclude that plaintiffs have not met their burden that the de
facto elimination of the community access program violates the
Due Process Clause.

**C.**   **Treatment**

Plaintiffs challenge the adequacy of the sex offender
treatment provided by the Treatment Center.  Healey and Given
voice concerns regarding the experience of FHS staff, the lack of
continuity of care, the timing and availability of
psychoeducational classes, and the overall effectiveness of sex
offender treatment.

First, they contend that FHS staff is not qualified to
provide meaningful sex offender treatment.  FHS's 2002 contract
states that unit therapists must be license-eligible clinicians
with a master's degree in social work, psychology, or counseling,
and have experience in sex offender treatment or a related area.
See Ex. 4 at 135.  FHS's 2011 contract adds that therapists
should have a minimum of two years experience in the treatment
and/or assessment of sexually aggressive persons.  See Ex. 5 at
DOC*266.  However, only 11 out of 29 FHS staff members have some
kind of mental health license.  Ex. 570.  At least two members of
Healey's treatment team have only bachelor's degrees.  See Exs.
46, 51.  And, FHS admits that not all of its therapists had
experience in treating sex offenders prior to being hired by FHS.

(Lyman, I-8, 52).  Moreover, the FHS contracts require the program director to be a licensed clinician with a doctorate in psychology.  See Ex. 4 at 137; Ex. 5C at 13.  However, current Program Director Kim Lyman only has a master's degree in counseling psychology and had no experience in treating adult male sex offenders before starting to work at the Treatment Center in 2005 as a unit therapist. (Lyman, I-8, 68).  While plaintiffs have proven violations of the contract, contractual violations, without more, are not violations of the Plan or Constitution.

Plaintiffs further contend the lack of continuity of care at the Treatment Center frustrates their ability to advance in treatment.  While Peltzman acknowledges that continuity of care between a therapist and a resident is an important factor in treatment, Healey and Given each have had 19 different people on their treatment teams since 2003-2004.  (Peltzman, I-9, 85; I-10, 36-37; Exs. 42-51; Exs. 98-104).  There also appears to be an uneven continuum of care due to changes in treatment providers and treatment models.  For example, when FHS took over from JRI, Healey was forced to retake psychoeducational courses that were substantively similar to courses he had already passed.  (Lyman, II-5, 30-31).  Moreover, FHS staff confirmed that residents who have passed courses under the old "relapse prevention" model will have to start over with courses offered in the recently

implemented "good lives" model.  (Lyman, II-5, 26-28).  It is unclear how much credit residents get for courses taken earlier. (Given, II-2).

Plaintiffs also have numerous complaints regarding the timing and availability of psychoeducational classes and group therapy.  For example, Given's primary group and scheduled psychoeducational classes often conflict with other work, educational, and recreational activities.  At times, he had to choose between performing his job or attending primary group therapy.  (Given, I-4, 30-31, 57).  When a resident misses more than two classes per quarter, he fails the class, and must repeat it in its entirety.  (Given, I-4, 31-32).  Classes and group therapy are sometimes interrupted or cancelled because of staffing shortages, drills, and emergencies.  (Given, I-4, 34-35; Murphy, I-5, 7-8).  Sometimes when a resident passes a prerequisite course and is clinically ready for the next course, the next course may not be available for several terms.  For example, after completing the Understanding Pathways to Offending I course, Given has had to wait at least three months to take Pathways to Offending II, delaying his ability to progress in treatment.  (Peltzman, II-4, 30-34).  Healey has attempted to gain admission to Pathways to Offending I, a required course to get into the Therapeutic Communities housing units, but has been denied admission in fall 2011 and winter 2012.  (Healey, II-1,

123-24).  Again, while these problems are undoubtedly
frustrating, plaintiffs have failed to demonstrate they rise to
the level of a constitutional deprivation of treatment or
violation of the Plan.

Plaintiffs also challenge the efficacy of the sex offender
program.[12]  In between the two trials, in November 2011, FHS
began implementing a "good lives" model of therapy delivered in
the context of therapeutic communities.  According to the Plan,
sex offender treatment should be provided "in the context of a
therapeutic community" offering primary group, specialty group,

---

[12]    It is difficult to assess the overall quality of the
sex offender treatment program because of the paucity of data.
(Peltzman, II-3, 54, 110-113; II-4, 21-22).  Plaintiffs' expert
Stan Stojkovic, a professor of criminal justice at the University
of Wisconsin-Milwaukee with an expertise on prison
administration, testified that to assess the effectiveness of a
sex offender treatment program, a correctional facility should
keep records documenting resource allocations, the number of
people matriculating in the program, what phases of the program
they are in, and what kind of outcomes the facility has that can
demonstrate success of the program. (Stojkovic, I-7, 61).
However, the Treatment Center does not collect data on these
issues.  (Id.)
     In 2004, the DOC began developing a research tool to assess
the quality of FHS' program and recidivism.  However, to date,
neither the DOC nor FHS has performed any study on the efficacy
of the treatment program.  (Murphy, I-4, 107; Connolly, Ex. 584,
at 109; Tomich, I-8, 35; Peltzman, II-3, 109).  The DOC does not
track the average length of commitment before release, the
average length of time residents are in treatment, the average
number of successful section 9 petitioners per year, the average
length of stay for residents in the CTH, the average number of
residents in the CTH per year, or the number of participants in
community access program.  (Luongo, II-5, 115-18, 123).
Remarkably, it does not even track recidivism rates upon release.
(Peltzman, II-3, 113).

behavioral treatment, experiential therapy, psychoeducational classes, and community-building activities.  Ex. 1 at 13-14; see also id. at 14 (Community-building activities "have a crucial therapeutic value which cannot be underestimated.").  Although the old "relapse prevention" model of treatment was not offered in the context of a therapeutic community, the current model of treatment is consistent with the Plan.

Plaintiffs complain that the defendants abolished many of the community activities and classes after the consent decree ended, and the environment became more punitive.  While true, some community-building activities have since been reinstated, and 77 percent of requests by residents have been approved.  While Family Day has not been reinstated, DOC officials have expressed security concerns about allowing residents to socialize with each others' family members.

In sum, FHS staff have sufficiently demonstrated their commitment to instituting therapeutic communities within the "good lives" model of therapy, which is at the cutting edge of cognitive behavioral therapy for sex offenders.  Accordingly, the court finds that the current sex offender treatment is in accordance with best professional judgment and does not violate the Plan or the Constitution.

**D.    Confidentiality of Treatment**

Given challenges the limits on confidentiality in therapy

treatment as a violation of his Fifth Amendment privilege against self-incrimination (Given, Count III).   Specifically, he alleges that residents are required to waive all rights to confidentiality as a condition of receiving treatment at the Treatment Center, and they are compelled to disclose past uncharged offenses as part of their treatment regimen.

At the Treatment Center, residents who participate in treatment are required to sign an informed consent form each year.[13]   It allows treatment records to be reviewed by "any member of the treatment team and by anyone else with legal authority to view the file (including attorneys, Qualified Examiners, Sex Offender Review Board, Board of Probation, Board of Parole, and others with such legal authority)."   Ex. 623. FHS's current contract adds that the DOC "maintains full and immediate access to all offender records," Ex. 5 at 59-60, and that FHS will make the records available to the Superintendent, DOC administrative staff conducting program audits, DOC attorneys, CAB members, Qualified Examiners, District Attorneys' offices, and "other persons legally entitled to review such records."   Ex. 5 at 60.   FHS staff confirmed at trial that if FHS receives a request from a District Attorney's office, it would turn over a resident's treatment records for section 9

---

[13] The informed consent form was amended in October 2011, in ways that are not material to this litigation.

proceedings.  (Lyman, I-8, 55).  However, there is no evidence that treatment records have ever been turned over to the District Attorney's office for new prosecutions, as opposed to section 9 proceedings.

Both Healey and Given say that the lack of confidentiality has made them distrustful of their therapists.  Given is concerned that what he tells his therapists will be used at section 9 trials against him.  (Given, II-2, 105).  Healey says he has sometimes refused to participate in group therapy due to concerns that his therapists' notes are being shared with others. See Ex. 48 at 4.  Joel Pentlarge, a former resident at the Treatment Center, and William Canavan, a current resident, both testified that they refused treatment because of fears what they tell therapists would be provided to the District Attorney's office.  (Pentlarge, II-2, 160-61); (Canavan, II-3, 6-7).  FHS staff recognize the Treatment Center's confidentiality policies have negatively affected the patient-therapist relationship, including the fact that therapists may be called by the Commonwealth to testify against a resident at his section 9 proceeding.  (Lyman, I-8, 67); (Connolly, Ex. 584 at 98-100).

One policy that has especially troubled residents regards the disclosure of uncharged sexual misconduct.  Under the old "relapse prevention" model of therapy, FHS therapists would encourage residents to disclose criminal sexual conduct for which

73

they had not been charged by prosecutors.  Exs. 118; 98 at 3.
Admissions of uncharged conduct were considered progress towards
completing the treatment plan and were part of the Achievement
Matrix. (Peltzman, II-3, 64-65, 143-44).  Therapists would
record detailed notes of what residents said in group therapy
sessions, and include lengthy quotations in their files.
(Orlandi, I-10, 76-77).

Under the "good lives" model of therapy, this policy has
changed.  Residents do not need to provide specific details of
previous criminal sexual activity, and therapists no longer
provide detailed notes regarding uncharged conduct in their
files. (Peltzman, II-4, 35).

"A program that provides treatment *if and only if* committed
individuals relinquish their Fifth Amendment rights is . . .
unconstitutional in that it imposes a cost — the loss of
constitutionally guaranteed treatment — on the assertion of the
right against self-incrimination." Pentlarge v. Murphy, 541 F.
Supp. 2d 421, 427 (D. Mass. 2008)(emphasis in original).
However, Given's Fifth Amendment claim fails because he has not
proven that, to take part in treatment, he is compelled to waive
his Fifth Amendment rights, as opposed to his right to
confidentiality.[14]  See McKune v. Lile, 536 U.S. 24, 35 (2002)

---

[14] Healey also suggests that the way in which treatment
records are kept and disseminated somehow violates the Plan or
14th Amendment.  However, the Plan contains no requirement

(holding mandatory sex offender treatment program's waiver of
confidentiality does not violate Fifth Amendment because the
program "does not compel prisoners to incriminate themselves in
violation of the Constitution"); <u>Ainsworth v. Stanley</u>, 317 F.3d
1, 6 (1st Cir. 2002)(holding nonmandatory sex offender treatment
program's waiver of confidentiality does not "compel
incriminating speech in violation of the Fifth Amendment").

It is true that under the previous relapse prevention model
of therapy, residents were encouraged to disclose uncharged
sexual misconduct, which was considered progress as part of the
Achievement Matrix.  Exs. 118; 98 at 3. (Peltzman, II-3, 64-65,
143-44); (Lyman, I-8, 64).  However, encouragement is not
compulsion, and Given was never prevented from participating in
treatment for failing to provide details about uncharged conduct.
Furthermore, under the "good lives" model, residents are no
longer urged to disclosed uncharged conduct to advance in
treatment.  (Peltzman, II-4, 35).

While the lack of confidentiality undoubtedly affects
residents' relationships with their therapists,[15] and the

---

regarding treatment records.  Furthermore, FHS keeps records in
accordance with ATSA recommendations and the American
Psychological Association, and there is no evidence that
residents' records have been improperly accessed.

[15] Given relies on the expert testimony of Dr. Saleh that
psychiatrists, psychologists and other professionals engaged in
the treatment of sex offenders generally believe that
confidentiality is essential to effective treatment.  (Saleh, I-

effectiveness of treatment, it is reasonably related to the
statutory purpose of evaluation so residents can be evaluated by
the CAB and Qualified Examiners regarding their level of sexual
deviancy and the need for continued commitment. <u>See</u> Mass. Gen.
L. ch. 123A, § 6A (mandating that the CAB "shall have access to
all records of the person being evaluated"); <u>Id.</u> § 9 (mandating
that the Qualified Examiners "shall have access to all records of
the person being examined," that "[e]vidence of the
person's . . . psychiatric and psychological records . . . shall
be admissible" in section 9 proceedings).

Furthermore, although Treatment Center staff will turn over
residents' records to district attorneys' offices to help prepare
for section 9 proceedings, there is no evidence that records or
confidential information about uncharged conduct have ever been
turned over to district attorneys for new prosecutions.  There is
also no evidence that any admission of uncharged conduct by a
resident has led to criminal prosecution or that refusal to
disclose uncharged conduct has led to termination of treatment.

---

6, 105-06).  The lack of confidentiality can affect a patient's
relationship with his therapist if the patient knows that the
therapist may share his private thoughts with others.  (<u>Id.</u> at
105, 107).  The patient is also more likely to withhold
information from his therapist.  (<u>Id.</u>)  For these reasons, the
American Counseling Association Code of Ethics, the American
Psychological Association Ethical Principles of Psychologists and
Code of Conduct, and the National Association of Social Workers'
Code of Ethics only permit disclosure of treatment communications
when required by law.

See McKune, 536 U.S. at 34 ("[N]o inmate has ever been charged or prosecuted for any offense based on information disclosed during treatment."); United States v. Puccio, 812 F. Supp. 2d 105, 108 n.2 (D. Mass. 2011) (To implicate the Fifth Amendment, the "risk of prosecution [must be] real 'and not a mere imaginary, remote or speculative possibility . . . .'")(quoting In re Morganroth, 718 F.2d 161, 167 (6th Cir. 1983)).

E.   **Behavior Management System**

Healey contends that defendants have violated the Plan's policies regarding the behavioral management system in three areas: (1) pre-hearing placement in the Minimum Privileges Unit ("MPU"), (2) misuse of the B-17 offense, and (3) the makeup of the Behavioral Review Committee.

Under the Plan, residents who violate rules and engage in inappropriate behavior may be issued Observation of Behavior Reports ("OBRs") by staff.  The Plan lists approximately 60 different offenses under four distinct categories (A-D), with "A" offenses being the most serious and "D" offenses being the least serious.  Ex. 1, App. 6 at 11-14.  "B" offenses are "High Category" offenses, including assaulting other persons, introducing illegal drugs into the institution, bribing staff members, and counterfeiting documents.  Id. App. 6 at 12.  The harshest sanctions, including placement in the MPU, are reserved for residents who have committed "A" and "B" level offenses.  Id.

App. 6 at 14-15.  The B-17 offense is for "[c]onduct which disrupts or interferes with the security or orderly running of the institution."  Id. App. 6. at 13.

Healey has received OBRs citing B-17 offenses for yelling obscenities, throwing food, possessing a cigarette lighter, and kicking the door to the MPU.  Exs. 79A, 85, 86, 322; (Healey, II-2, 14-16, 18-19).  He was sentenced to time in the MPU for many of these offenses.

Given received an OBR for improper use of mail for sending a letter complaining about the DOC's policy regarding payment of print shop employees.  (Given, I-4, 51-52).  Superintendent Corsini subsequently had the OBR dismissed, finding it unwarranted.[16]  (Corsini, I-6, 30-31).  Given has never spent time in the MPU.

### 1. MPU Policy

The MPU is a highly restrictive unit containing 12 cells where residents are restricted to their cell 23 hours a day.  MPU residents eat their meals in their cells and are allowed out of their cells one hour a day for exercise and showers.  Residents

---

[16] On two occasions Given received books in the mail which were treated as contraband and taken from him.  The first time the book was a nonfiction book Given thought could help him in therapy.  The treatment staff thought it was inappropriate, and Given allowed it to be destroyed rather than receiving and reading it.  The second time he received a book as a gift that had an inappropriate scene.  (Given, II-2, 135).  Given did not receive an OBR on either occasion.

confined to the MPU do not have contact with other residents. According to the Plan, "[i]n all instances, the matter of MPU placement, review and discharge is based upon security assessments subject to clear criteria set forth in the [MPU] policy."  Ex. 1 at 30.

A resident can be placed in the MPU pending an investigation or hearing on an OBR when the resident is: (1) charged with a category A offense (Greatest Severity) or (2) charged with a B offense (High Severity) "but only where . . . the resident's behavior creates an emergency situation where, (a) the resident has attempted or did serious harm to others, or (b) the resident's conduct clearly demonstrates a serious and imminent threat that he will harm, or attempt to harm others."  Ex. 1 App. 7 at 4-5.  The Plan adds that "[f]or each resident sent to the [MPU] pending an investigation [or hearing on an OBR for B offenses], an incident report shall be written documenting the need for placement in that unit."  Id.  For residents sent to the MPU pending a hearing on an OBR, the incident report "shall indicate what behavior was observed, by whom, the basis for the belief that the resident poses an imminent threat of serious harm to himself or others, and the name of the individual who recommended placement.  This report will be delivered promptly to the resident within 48 hours of the initial placement."  Id. at 4.

Around 2003, the DOC stopped following the MPU policy in the Plan and residents became subject to the same policy used for criminal inmates.  (Murphy, I-5, 33-34; Smith, I-9, 45-46); Exs. 13, 14.  Under this new policy, the DOC had greater discretion when placing residents in the MPU and did not need to provide written documentation explaining the need for the placement.  For example, residents have been placed in the MPU for refusing to accept a housing assignment change, including being double-bunked, and have been confined in the MPU as long as six months pending a hearing. (Luongo, I-10, 111-12; Smith, I-9, 40-41).

Healey has been placed in the MPU multiple times pending an investigation or hearing on an OBR.  For example, in February 2005, Healey was placed in the MPU pending a hearing on an OBR citing B-17 and D-2 offenses.  The written Notice of Placement in MPU states that Healey's confinement in the MPU was for "disruptive behavior."  Ex. 561.  It does not indicate what specific behavior was observed or the basis for the belief that Healey posed an imminent threat of serious harm to himself or others.  In January 2007, Healey was placed in the MPU pending an investigation related to two cigarette lighters found in his possession.  The written Notice of Placement in MPU did not identify any basis for Healey's confinement in the MPU.  See Ex. 559. Director of Security Steven Fairley testified that the lighters posed a security threat because they can start fires and

can be used to aid in other inappropriate activities. (Fairley,
I-9, 56).   In January 2011, Healey was again placed in the MPU
pending an OBR hearing for B and C level offenses.   There is no
Notice of Placement in MPU for this incident or any other written
documentation identifying any basis for suggesting Healey's
behavior created an ongoing security risk or an emergency
situation.   See Ex. 580 at 1-2.

Soon after the July 2011 trial in this case,[17] DOC modified
the MPU policy to add back in the procedural safeguards stated in
the Amended Management Plan.   Under the current policy, placement
in the MPU pending an investigation or hearing on an OBR may only
occur "when the Superintendent or his designee has determined
that the continued presence of the Resident in the general
population would pose a serious threat to life, property, self or
others or the security or orderly running of the institution . .
." Ex. 611.

As such, while the Treatment Center was in violation of the
Plan with respect to the procedural safeguards for the MPU,
defendants seemed to have fixed the problem.

**2. The B-17 Offense**

The Plan calls for a disciplinary system with "clearly

---

[17] While the new policy appears to be signed January 4, 2011,
this is most likely a typo.   Superintendent Corsini testified
that the policy is new since the summer of 2011, and its
effective date most likely is January 4, 2012.   See Ex. 611;
(Corsini, II-4, 69-70).

defined rules and clearly defined repercussions for rule
breaking" that is "viewed as more equitable by Residents,
officers and therapists." Ex. 1 at 29-30.  Healey contends that
the DOC violates the Plan by charging residents with B-17
offenses for conduct that is not deserving of such a serious
charge.  The B-17 offense broadly covers any conduct "which
disrupts or interferes with the security or orderly running of
the institution." Id. App. 6. at 13.  The B-17 offense itself is
listed in the Plan.  Healey contends it has been inappropriately
applied to less serious charges such as yelling obscenities.

Healey has received over 200 OBRs, including many B-17
offenses.  Some of his B-17 offenses have later been dismissed.
Given has provided evidence that he was charged with a B-17
offense for improper use of mails.  While this does appear to be
a misuse of the B-17 offense, plaintiffs have not demonstrated a
substantial violation of the Plan because Given's charge was
later dismissed.  While there may be occasions where the B-17
offense is too broadly used, the appeal process provides adequate
due process protections.  Accordingly, plaintiffs have failed to
prove a material violation of the Plan with respect to charging
decisions.

### 3. Behavioral Review Committee

Under the Plan, the Behavioral Review Committee ("BRC") must
consist of "three persons appointed by the Superintendent; one

security staff member, one clinician and one program staff member." Ex. 1, App. 6 at 5.  The parties dispute whether the "program staff member" means a treatment staff member or a DOC officer.  The ambiguity arises from the district court's description in King:  "The BRC is a three-member board consisting of one security staff member, one clinician, and one JRI staff member." King IV, 53 F. Supp. 2d at 127.  Today, the BRC is always comprised of two DOC officials and only one FHS staff member.  Defendants argue that the Plan allows for two DOC members (the security staff member and the program staff member) and one treatment staff member (the clinician).  They contend that the "program staff member" refers to DOC's correction program officer listed in Appendix 3 to the Plan.  See Ex. 1 App. 3 at 3.  Dr. Schwartz testified that even when JRI provided treatment at the facility, the BRC consistently consisted of one JRI staff person, one correction officer, and one program correction officer.  (Schwartz, I-2, 90).  Although an ambiguity does exist in the Plan, based on Dr. Schwartz's testimony and longstanding DOC practice, Healey has not proven that the Plan requires two treatment staff members and only one DOC member.

**F.    Differing Levels of Security & Privileges**

Healey argues that the Treatment Center is violating the Plan's requirement to provide "differing levels of security and privileges in order that residents can be maintained in the

'least restrictive conditions' of confinement." Ex. 1 at 6.

The DOC operates the Treatment Center as a Level 4 medium security correctional facility. (Corsini, I-6, 29-30); (Luongo, I-10, 117). In the main facility, all residents are classified at the same security level regardless of their age, offenses, years in treatment, or psychological diagnosis. (Luongo, I-10, 123-25); (Corsini, I-6, 6, 10). The only time the DOC evaluates residents' risk levels is when determining their job placements or eligibility for being double-bunked. (Luongo, II-5, 95, 115).

With limited exceptions, residents are all subject to the same movement and property policies. Regarding the movement policy, all residents in the main facility are subject to controlled movement, where they must sign out from their housing units before moving to another part of the facility and have a short period of time to move from one place to another. (Luongo, I-10, 122-23). Regarding the property policy, residents are subject to the same property rules as Level 4 prison inmates, with the exception of residents confined under the pre-1990 civil commitment statute, who may retain certain property if it was on their property log on Feb. 3, 1997. (Murphy, I-4, 125-26); Ex. 18, 103 CMR 403; Ex. 19.

As Professor Stojkovic testified, and Superintendent Corsini admitted, for the vast majority of residents, the Treatment Center operates like a medium security prison designed primarily

84

to keep people safe and secure.  (Stojkovic, I-7, 30, 32;
Corsini, II-4). Corsini has increased security measures at the
Treatment Center, which has led to a nearly 75 percent decrease
in reports of sexual misconduct.  He has also adopted tougher
mail, property and visiting regulations to reduce the amount of
drugs and pornography coming into the institution.

Although Healey requests the Court to order additional
changes to the movement and property policies inside the main
facility based on an individualized assessment of each resident's
risk level, nowhere does the Plan call for these changes, and the
Court refrains from micromanaging what specific movement and
property policies are best for security and control at the
Treatment Center.

Regarding differing levels of privileges, Healey argues that
before the "good lives" model of therapy, the tiered privilege
system at the Treatment Center was so limited as to violate the
Plan's requirement for a meaningful privilege system intended to
incentivize residents to advance in treatment.  As discussed
earlier, plaintiffs proved that the DOC did violate, and
continues to violate the Plan in failing to provide enhanced
privileges in a community access program and CTH.  However,
beginning in November 2011, the Treatment Center has worked with
residents to develop a more robust privilege policy in other
respects, with the DOC approving 77 percent of initial privileges

85

requested by residents.  These privileges included spiritual clubs, peer aides for psychoeducational classes, Residents of the Month, and game night.  (Peltzman, II-3, 55, 59).  The privileges rejected by the DOC included having outside visitors in the recreation yard and ordering food from outside institutions. (Peltzman, II-3, 140; Tomich, II-5, 167).

Under the new model, privileges are only available to residents participating in treatment.  Residents who refuse treatment are not permitted any privileges, and Superintendent Corsini removed the few privileges they had, including the laundry machines, microwave, and refrigerator in their housing unit.  (Corsini, II-4, 104-05).  Corsini takes the position that he has the ultimate discretion to remove whatever privilege he deems appropriate "given the correctional environment in which [he is] working." (Id. at 101).  This stance is incorrect to the extent his motives are punitive.  However, based on this record, deprivations of privileges have been reasonably related to the custody and security of residents.  One privilege available in the Plan is the ability of residents to visit each other's rooms, or "room visits."  While room visits were allowed in 1999, then-Superintendent Murphy ended the privilege around 2002 because of sexual assaults among residents and other security issues, such as strong arming, assaults, substance abuse, and escape planning. (Murphy, I-5, 28-29, 68, 82); see Ex. 2 at 36.  Corsini firmly

reaffirmed that he would never allow room visits as long as he runs the Treatment Center.  (Corsini, II-4, 124).  Demonstrating serious security concerns, DOC has proven that these measures are within its discretion allowed under the Plan.  Because this new privilege system is in accordance with the Plan, and any restrictions on privileges are reasonably related to security concerns, injunctive relief is not warranted.

## G.   **Plaintiffs' Conditions of Confinement**

The plaintiffs allege many of their conditions of confinement violate the Plan and the Fourteenth Amendment.  Given alleges that the conditions fail to provide the "least restrictive alternative" (Given, Count I) and fail to provide accommodations that meet the minimum standards for human habitation in violation of his due process rights. (Given, Count V).  In addition to Healey's claims under the Plan, he also alleges that forcing him to exercise in the wire cage while detained in the MPU violates his due process rights. (Healey, Count V).  Plaintiffs also challenge the following conditions: the visitation policy, property regulations, limiting library access, availability of vocational and educational programs, double-bunking and cell size, window-viewing restrictions, toilet access in the exercise yard, and restraints and strip searches.[18]

---

[18] Plaintiffs also had claims challenging the use of toilet timers and shower timers, food quality, and clean water supply, but Judge Gertner dismissed those claims during the first trial.

The Court previously ruled that "[a]lthough these conditions may not state a due process claim when considered individually, [they could] when taken together." Healey v. Murphy, 2007 U.S. Dist. LEXIS 100060, at *34 (D. Mass. Nov. 14, 2007).  As mentioned above, conditions of confinement for residents violate due process if they are punitive or otherwise unrelated to care, custody, treatment and rehabilitation, the statutory purposes for civil commitment under Chapter 123A.  See Seling, 531 U.S. at 265.  Although Given's claim and the consent decree litigation referred to a "least restrictive conditions of confinement" standard, that standard sets "a higher standard than the Constitution." Langton v. Johnston, 928 F.2d 1206, 1217-18 (1st Cir. 1991); see also Allison v. Snyder, 332 F.3d 1076, 1078 (7th Cir. 2003) (plaintiffs lacked any federal authority for their proposition that Constitution entitles civil detainees to least restrictive environment).

Plaintiffs have demonstrated a decline in some of their living conditions since the DOC took over control of the Treatment Center, and certain conditions are more restrictive than those at some other prison facilities across Massachusetts. However, this disparity in and of itself is not dispositive as to whether the conditions violate the Fourteenth Amendment.  Cf. Hubbard v. Taylor, 538 F.3d 229, 236 (3rd Cir. 2008)("[N]owhere [has] the Supreme Court suggest[ed] that if [pretrial] detainees

are treated differently or worse than convicted inmates, they are
. . . being 'punished' in violation of the Due Process Clause.").
Defendants emphasize that the Treatment Center has achieved 100
percent compliance with all mandatory standards of the American
Correctional Association ("ACA") since the termination of the
consent decree litigation, and that there is no evidence that any
of the physical conditions pose a risk to human safety or health.
After a review of the record, the Court concludes that whether
analyzed individually or combined together, none of the
challenged physical conditions of confinement reach the level of
a Constitutional violation.  Specific challenged conditions are
addressed separately below.

**1. Restrictions in Library Hours and Visitation Privileges**

At the time the Plan was implemented, residents had access
to the library five days a week plus one evening session.
Because of the Durfee opinion, library access at the Treatment
Center has been approximately cut in half.  Residents only have
access to it for part of the day on Monday, Tuesday, Wednesday,
and Friday for a total of approximately 16 hours.  (Given, I-4,
11-12, 20); Ex. 586 at 70-71.  Today, residents receive around
half as much library time as inmates at other DOC prison
facilities.  Ex. 591 at 32-34.

Visitation privileges are also more restrictive now than
what they were during the Plan's implementation.  Visitation

89

hours have been approximately cut in half after the <u>Durfee</u>
decision.  On occasion, summer hours have been further
restricted, and Treatment Center officials have placed
limitations on the number of visitors allowed to visit in a given
day. (Healey, II-1, 160).  More recently, Superintendent Corsini
added a new restriction, which prohibits residents and inmates
from wearing black dress pants in the visitation room, in order
for security officials to differentiate between them and their
visitors. (Corsini, II-4, 113).

The Plan does not specify how many library hours are
required.  Detainees "have a constitutionally-protected right of
meaningful access to the courts . . . [and] correctional
authorities must 'assist inmates in the preparation and filing of
meaningful legal papers by providing prisoners with adequate law
libraries or adequate assistance from persons trained in the
law.'"  <u>Boivin v. Black</u>, 225 F.3d 36, 42 (1st Cir. 2000)(quoting
<u>Bounds v. Smith</u>, 430 U.S. 817, 828 (1977)).  To state a
constitutional violation, a detainee must "demonstrate that the
alleged shortcomings in the library . . . hindered his efforts to
pursue a legal claim."  <u>Lewis v. Casey</u>, 518 U.S. 343, 351 (1996);
<u>see also</u> <u>Shell v. Brun</u>, 585 F. Supp. 2d 465, 468 (W.D.N.Y.
2008)("Prison officials may place reasonable restrictions on
inmates' use of facility law libraries, as long as those
restrictions do not interfere with inmates' access to the

courts."); Shango v. Jurich, 965 F.2d 289, 292-93 (7th Cir. 1992) (holding that closing of prisoner law library on nights, weekends, and holidays, and at other times due to lockdown, construction, or shortage of guards or librarians, does not violate Constitution absent evidence of any detriment or prejudice suffered by prisoner in any litigation); Walker v. Mintzes, 771 F.2d 920, 931 (6th Cir. 1985) (Constitution does not mandate "any specific amount of library time which prisoners must be provided; rather, access need only be reasonable and adequate.").

The Plan gives the superintendent discretion to modify visitation hours.  Civil detainees have no constitutional right to contact visits.  See Block v. Rutherford, 468 U.S. 576, 589 (1984)("[T]he Constitution does not require that detainees be allowed contact visits when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility."); Carter v. Blake, 2006 U.S. Dist. LEXIS 55058, at *4-6 (E.D. Mo. Aug. 8, 2006)(dismissing claim that civilly committed sex offender has constitutional right to contact visits with family and friends); Rainwater v. McGinniss, 2012 U.S. Dist. LEXIS 113963, at *37-38 (E.D. Cal. Aug. 10, 2012)(same).

The reduction in visiting and library hours, and other restrictions to the visitation policy, do not violate the Plan or

91

the Constitution.  These changes have largely occurred in response to the Durfee opinion's mandate to keep prison inmates and residents separate and apart at all times.  Therefore, these restrictions are reasonably related to maintaining care and custody of the residents.  Furthermore, plaintiffs have not proven that the reduction in library hours hindered their efforts to pursue a legal claim.

### 2. Property Regulations

For the most part, residents at the Treatment Center are subject to the same property rules as inmates at Level 4 medium security prisons, with two main exceptions.  See Ex. 18.  First, residents committed prior to February 3, 1997, like Healey, may retain certain property, including memory typewriters and personal computers, that had been listed on their property logs. Ex. 19.  Second, residents committed after that date, like Given, are not entitled to any additional property except that Superintendent Corsini recently approved electric razors for residents who have a medical condition that makes it difficult for them to hold a regular razor.  (Corsini, II-4, 68, 103).

The Treatment Center's strict property regulations do not violate plaintiffs' due process rights because DOC staff credibly testified they are necessary to reduce the amount of contraband coming into the facility, including drugs and pornography. (Smith, I-9, 18).  The regulations are thus reasonably related to

the care and custody of residents, and the court defers to the DOC's reasonable professional judgment on this issue.

### 3. Vocational and Educational Programming

Educational and vocational opportunities have declined since the Amended Management Plan became the Treatment Center's governing document in 1999.  While JRI and FHS previously had been in charge of developing educational and vocational opportunities at the Treatment Center, between 2007 and 2008, DOC assumed responsibility for the academic and vocational programs. Ex. 575, ¶ 3.  At present, the DOC does not offer some of the programs specifically identified in the Plan, including sewing, electronics, and an extensive culinary arts program.  (Healey, II-1, 144-46).

The vocational programs currently offered are the computer program, building trades program, and a limited culinary arts course.  Ex. 576, ¶¶ 3, 5-7; Ex. 578.  The computer program includes classes on various Microsoft applications such as Word, Access, Excel, and Powerpoint.  Ex. 576, ¶ 6.  The building trades program includes components on safety, hand tools, power tools, drafting and blueprints.  This program also includes instructions on basic construction trades such as how to construct floors, walls, stairs, roofing and framing doors and windows.  Ex. 576, ¶ 7.  The culinary arts program, called "SERV Safe," is limited to teaching the basics of handling food and

keeping food at the right temperature.  (Lyman, II-5, 31).  No certificate programs are offered at the Treatment Center. (Healey, I-3, 68; Given, I-4, 14).

Educational opportunities offered at the Treatment Center include programs in the areas of general equivalency diploma (GED), adult basic education (for students in the fourth to sixth grade levels), pre-GED (for students in the sixth to eighth grade levels), special education, English as a Second Language, music, art, and life skills.  Ex. 576, ¶ 4.  The life skills class includes material on basic re-entry skills, such as resume writing, searching for a job and preparing for interviews, banking issues and current events.  Ex. 576, ¶ 4.  However, no college-level courses are available at the Treatment Center.

Residents also have a variety of employment opportunities, including as janitors, barber shop workers, canteen workers, environmental health and safety officer aides, grounds workers, gym workers, intensive treatment program unit tutors, kitchen servers, laundry workers, learning center aides, library aides, maintenance department workers, photographers, property workers, recycling workers, and staff grill workers.  Ex. 577, ¶ 2.  The Treatment Center also offers a program by Massachusetts Correctional Industries, a division of DOC, which employs residents in a print shop to silk-screen clothing, signs, and stickers, and to make license plates for the Registry of Motor

94

Vehicles.  Ex. 579, ¶¶ 1-2.

Healey cannot participate in the building trades program because he experiences hand tremors and cannot safely handle certain equipment.  (Healey, II-1, 146-47).  Healey has applied for and been rejected from the print shop, but was enrolled in the SERV Safe class.[19]  Given worked in the print shop until April 2011, when he was fired for writing a letter complaining about DOC's policy not to pay print shop employees on snow days.  (Given, I-4, 51-52).  While Superintendent Corsini permitted Given to reapply for his job at the print shop, Given has not been reinstated.  (Id.; Corsini, I-6, 31).

The reduction in vocational and educational programs at the Treatment Center does not violate the Constitution or the Plan.  These reductions have primarily occurred because of the Durfee opinion's separate and apart policy, which, as stated above, is reasonably related to residents' care and custody.  Furthermore, while the Plan intended that the DOC "maintain the current [educational and vocational] programming" offered at that time, see Ex. 1 at 23, the Court does not interpret the Plan as

---

[19] Defendants claim that Healey lacks standing to challenge the availability of jobs at the Treatment Center.  At summary judgment, Judge Gertner ruled that Healey has standing to pursue these claims.  See Healey v. Murphy, 2011 WL 2693688, at *4 (D. Mass. July 8, 2011).  After trial, the Court agrees that Healey has standing to pursue these claims based on his testimony that he would seek participation in certain vocational and educational opportunities if they were available today.

requiring the Treatment Center to provide all vocational and educational programs listed in it forever.  What the Plan requires is vocational and educational programs that "promote individual academic, personal and vocational skills, utilizing both traditional and innovative educational and vocational techniques."  Id.  While the offerings are more limited than before, the current programming meets this requirement.

### 4. Double-Bunking and Cell Size

No residents were double-bunked when Judge Mazzone lifted the consent decrees in June 1999. (Murphy, I-5, 23).  Because the Massachusetts legislature had abolished civil confinement in 1990, the Plan was premised on the assumption that the resident population at the Treatment Center would gradually decline as residents were released pursuant to section 9 proceedings or died.  Ex. 1 at 46; (Murphy, I-5, 19).  Therefore, the Plan did not contemplate double-bunking for residents.  However, the Plan does state that "[i]f [double-bunking] were to become desirable at some time in the future, the Department of Correction will follow the protocols described in the original plan."  Ex. 1 at 46.  The original 1994 plan states that double-bunking can offer "a therapeutic advantage over single room housing by providing residents the opportunity to develop essential relationship and social skills.  Double bunking is used successfully in sex offender treatment programs in other states . . ."  Ex. 2 at 135.

The 1994 plan states that if double-bunking becomes necessary, the security staff will conduct assessments for each resident to gauge their escape risk and history, enemy situations, aggression, and compliance, and the clinical treatment teams will conduct assessments to gauge compatibility for double-bunking, medical issues, religious beliefs, and requests from residents themselves.  Id. at 135-36.

In September 1999, Massachusetts restarted civil confinement, and the resident population has continued to grow ever since from 171 in December 1999 to 245 by October 2011.  See Ex. 632 at 2; Ex. 325 at 5.  To accommodate this growth, the DOC started double-bunking in December 2003.  Ex. 330 at 10; Ex. 584 at 55.  As of February 2012, over 100 residents were double-bunked.  While double-bunking of residents is consistent with the 1994 plan, the Treatment Center's current housing arrangement violates both American Correctional Association ("ACA") standards and Massachusetts Department of Public Health ("DPH") regulations.  ACA Standard #4-4129 requires that the number of inmates not exceed the facility's rated bed capacity.  Ex. 38A at 19-21.  While the Treatment Center's population is higher than its rated capacity of 216, the DOC was granted a waiver from this standard in 2008.  Ex. 38A at 1; 38B at 2-3.  DPH regulations recommend that "[e]ach cell or sleeping area in an existing facility should contain at least 60 square feet of floor space

for each occupant, calculated on the basis of total habitable room area, which does not include areas where floor-to-ceiling height is less than eight feet." 105 CMR 451.320.  In part because of double-bunking, the Treatment Center does not comply with this regulation and has been cited by the DPH multiple times for failing to adhere to it.  <u>See</u> Ex. 571.  The DOC has taken the position that it does not need to provide at least 60 square feet of floor space for each resident because this regulation is a recommended, not a required, standard. (Murphy, I-5, 49, 51-52); Ex. 564.

Many residents have been resistant to double-bunking. Former Superintendent Murphy received letters from residents, including Pentlarge, objecting to their double-bunking assignments.  (Murphy, I-5, 46-49); Ex. 563; Ex. 564.  Given has been double-bunked since April 2004.  (Given, I-4, 18-19).  He has complained to his therapists and housing officers multiple times about his double-bunking assignment, and at times, says he has been unable to sleep because of his roommate.  <u>See</u> Ex. 356. Treatment Center staff have not granted Given's request for a single room, and a housing officer told him that he would not live long enough to see a single cell. (Given, I-4, 62-63, 80). Healey is in a single cell because of his behavioral issues.

The First Circuit has already held that double-bunking of residents at the Treatment Center "is not a per se violation of

due process." <u>Cote v. Maloney</u>, 152 Fed. Appx. 6, 7 (1st Cir. 2005)(unpublished).  This is also not one of those "rare cases" where double-bunking "amount[s] to an unlawful practice when combined with other adverse conditions." <u>Id.</u>  Although the Treatment Center's current housing arrangement violates ACA standards and DPH regulations because of double-bunking and small cell sizes, these standards are only advisory, and Given has not proven that the Treatment Center is so overcrowded as to violate due process.  <u>Cf.</u> <u>Brown v. Plata</u>, 131 S. Ct. 1910, 1923 (2011)(upholding the district court's finding of the unconstitutionality of overcrowding of prison where it had "overtaken the limited resources of prison staff; imposed demands well beyond the capacity of medical and mental health facilities; and created unsanitary and unsafe conditions that make progress in the provision of care difficult or impossible to achieve.").

### 5. Toilet Access in the Exercise Yard

Until early January 2012, no restroom facilities existed in the recreation yard.  Residents who needed to use the restroom were required either to urinate and defecate in the yard or end their exercise time early, because it was practically impossible to access restrooms inside the Treatment Center and return to the yard within the recreation time period.  (Pentlarge, I-3, 13; Given, I-3, 128-29).  Despite years of complaints, the DOC installed two port-o-potties in the yard only days before the

second trial began in this case.  (Corsini, II-4, 71).

In Judge Mazzone's ruling terminating the consent decrees in 1999, he indicated that "[f]unds are being sought from capital planning funds to install toilet facilities accessible to the yard to attempt to address the residents' complaint about the lack of toilet facilities in the yard." King IV, 53 F. Supp. 2d at 134.  It took until January 2012 to finally install two port-o-potties in the yard.  In 1999, the court did not address the issue because it found no evidence that the lack of toilet facilities "force[d] an individual to defecate or urinate while in the yard." Id.  However, in this case, residents testified men were forced to defecate and urinate in the yard or forced to return to the main facility and give up their exercise time. (Pentlarge, I-3, 13; Given, I-3, 128-29).  As this Court previously stated, due process requires that residents not be "'denied adequate opportunities for exercise without legitimate governmental objective.'" Healey v. Murphy, 2011 WL 2693688, at *3 (D. Mass. July 8, 2011)(quoting Pierce v. County of Orange, 526 F.3d 1190, 1211-12 (9th Cir. 2008)).  Making residents choose between their constitutionally protected right to exercise and their basic human needs is not reasonably related to any of the statutory goals.  Furthermore, the Treatment Center has not provided a legitimate government objective for not having toilet facilities in the yard.  That said, the issue has been flushed

out because the Treatment Center has installed toilets in the
yard as a result of this litigation.

### 6. Restraints and Strip Searches

Residents are subjected to strip searches every time after
they return from court, doctor's appointments, evaluations by
Qualified Examiners, and after visits, including professional and
attorney's visits.  (Healey, II-1, 165-67; Corsini, II-1, 93-94).
The strip search includes removing all clothes, an orifice check,
lifting their scrotum, brushing fingers through their hair,
opening their mouth, and bending them over and spreading their
butt cheeks.  (Given, II-2, 131).  This policy is harsher than
what Given experienced when detained at NCI-Gardner, a medium
security prison facility in Massachusetts.  There, he was not
strip searched after professional visits.  Residents are also put
into shackles, cuffs, and leg irons whenever they go outside the
perimeter of the Treatment Center building.  Both plaintiffs
experienced this type of restraint when attending their court
hearings.  (Healey, II-1, 164-66).  Defendants contend that the
strip search policy is necessary to stem the flow of contraband
into the facility, including pornography, cigarettes, lighters,
and certain medication.

Assessing any strip search under the Fourth Amendment
requires "a balancing of the need for the particular search
against the invasion of personal rights that the search entails."

<u>Wood v. Hancock County Sheriff's Dep't</u>, 354 F.3d 57, 67 (1st Cir. 2003)(internal quotations omitted).  In <u>Wood</u>, the First Circuit found a strip search after a contact visit with an attorney to be constitutional, holding that "except in atypical circumstances, a blanket policy of strip searching inmates after contact visits is constitutional."  <u>Id.</u> at 69; <u>see also</u> <u>Florence v. Bd. of Chosen Freeholders</u>, 132 S. Ct. 1510 (2012)(upholding blanket policy of strip searching all arrestees admitted into general prison population without reasonable suspicion inquiry).

Plaintiffs contend that the strip search policies at the Treatment Center are excessive and demeaning to residents. Defendants have presented sufficient evidence that these policies are reasonably related to the goals of care and custody, in particular stemming the flow of contraband into the facility.  In this case, balancing residents' privacy rights with the Treatment Center's security interests, the use of strip searches and restraints are not so excessive as to violate residents' due process rights.  <u>See</u> <u>Wood</u>, 354 F.3d at 67-69; <u>see also</u> <u>Marchant v. Murphy</u>, No. 05-12446-RGS, Doc. 67 at 40-44 (D. Mass. June 17, 2009)(denying claim by civilly committed sex offender at the Treatment Center that strip search policy, including strip searches after attorney visits, violated the Constitution).

**7. Window-viewing Restrictions**

Residents are not permitted to look out of windows which

look onto the main corridor of the Treatment Center.   Under these
windows are stenciling which reads "No standing or sitting in
this area."  (View, II-1, 15).   According to Superintendent
Corsini, the reasons for this restriction are the need to prevent
residents from staring at staff, particularly female staff, in
the main corridor and the need to limit communication with
residents exercising in the wire cage right outside. (Id. at 15-
16).  With respect to the first rationale, a resident would have
to be eagle-eyed to get much of a view of anybody walking down
the hall in the opposite building.   Moreover, the windows do not
appear to be open, making meaningful communication with those in
the cage unlikely.   Still, in light of the fact that the
residents can look out of other windows, which provide natural
light, this restriction is not so overly restrictive as to be
punitive.

### 8. The Cage

According to the Plan, residents in the MPU "shall receive a
minimum of one (1) hour a day, five (5) days per week, of
exercise outside their cell, unless security considerations
dictate otherwise.   Normal exercise periods will be located in
the . . . yard."  Ex. 1, App. 7 at 10-11.   The Plan adds that no
more than four Phase II (the less restrictive MPU phase)
residents can exercise in the yard together, and Phase I
residents must exercise alone.   Id. at 11.

Today, MPU residents are permitted to exercise one hour per day, five days per week in a small outdoor wire cage built in 2000.  Ex. 324-43; (Healey, I-3, 82-83, 85; Murphy, I-5, 111-12; Luongo, II-5, 109).  They are not permitted to use the indoor gym.  (Luongo, II-5, 111).  The DOC constructed the wire cage to comply with a non-mandatory ACA standard requesting that prisoners in segregated units have access to covered/enclosed exercise areas for use in inclement weather.  (Murphy, I-5, 111-12).  The ACA states that "use of outdoor areas is preferred, but covered/enclosed areas must be available for use in inclement weather."  § 3-4147, ACA 1998 Correctional Standards Supplement.

Due process requires that residents not be "'denied adequate opportunities for exercise without legitimate governmental objective.'"  Healey v. Murphy, 2011 WL 2693688, at *3 (D. Mass. July 8, 2011)(quoting Pierce v. County of Orange, 526 F.3d 1190, 1211-12 (9th Cir. 2008).  "Determining what constitutes adequate exercise requires consideration of 'the physical characteristics of the cell and [facility] and the average length of stay of the inmates.'"  Pierce, 526 F.3d at 1212 (quoting Housley v. Dodson, 41 F.3d 597, 599 (10th Cir. 1994)); see also Housley, 41 F.3d at 599 ("[N]o precise standards have been set forth delineating what constitutes constitutionally sufficient opportunities for exercise . . .").  "Legitimate nonpunitive governmental objectives include maintaining security and order and operating

the [detention facility] in a manageable fashion." <u>Pierce</u>, 526
F.3d at 1205 (internal quotations omitted).

This Court previously stated that "the question whether use
of the wire cage deprived Healey of substantive due process
[depends on] facts concerning, inter alia, the average length of
Healey's confinements in the MPU, the number of hours he has
spent in a cell, the dimensions of the wire cage, and the
justification, if any, for the lack of access to the yard."
<u>Healey</u>, 2011 WL 2693688, at *3.   The longest time Healey spent in
the MPU was nine days.

Since the 10' x 18' x 12' cage was built in 2000, Healey has
exercised in it only two to three times and found it degrading
and humiliating.  (Healey, I-3, 84; II-2, 22-23).   The cage was
initially constructed with a temporary roof in 2000.   The
temporary roof blew off in a windstorm a few years ago, and a
permanent roof was not put on until November 2011.   In the
interim, the only option for MPU residents to exercise outside of
their cell remained the uncovered cage, even in inclement
weather.  (Luongo, II-5, 110-11).

Based on these facts, use of the wire cage for residents in
short-term segregation, without more, does not violate Healey's
due process rights because of the short duration of his

confinement in MPU.[20]  The cage permits residents to perform the
most basic exercises and is reasonably related to the care and
custody of residents detained in the MPU for disciplinary
reasons.  During the years the cage had no roof, severely
limiting the ability of MPU residents to exercise during
inclement weather, residents were denied adequate opportunities
for exercise.  However, just before the second trial, a permanent
roof was built for the cage, so the cage does not currently
violate the Constitution.  An injunction is unnecessary.  Cf.
Gholson v. Murry, 953 F. Supp. 709, 723 (E.D. Va. 1997) (holding
that 8' X 20' enclosed exercise area not small enough to violate
Constitution absent "evidence suggesting that [inmates] cannot
adequately exercise within the area provided.").

## H.   Telephone Policy

Because some residents were using the telephone system for
inappropriate and criminal activities, the Plan established a
telephone policy at the Treatment Center where residents are
provided a Personal Identification Number ("PIN") to use to place

---

[20] The Court takes no position on the constitutionality of
the cage for longer terms of confinement.  At least one resident
has been confined in the MPU as long as six months.  While
defendants balk at calling the enclosed exercise area a "cage,"
that is precisely what it looks like.  Although DOC staff created
a fitness manual designed for MPU residents, the manual contained
– perhaps as a practical joke – Canadian helicopter signaling
instructions.  Exs. 621, 631. The peculiar addition of helicopter
instructions to a fitness manual raises doubts that the DOC is
committed to ensuring MPU residents receive adequate exercise.

calls.  Residents are allowed to select ten personal and five legal phone numbers to call using their PIN.  Ex. 1 at 41.  The Plan permits the DOC to record all non-legal phone calls.  Id. The telephone policy continues to be used at the Treatment Center.

Given alleges that the Treatment Center's telephone system, which permits the DOC to monitor all non-legal calls, violates his First Amendment and substantive due process rights (Given, Count II).  Regarding the First Amendment, "persons incarcerated in penal institutions retain their First Amendment rights to communicate with family and friends, and . . . there is no legitimate governmental purpose to be attained by not allowing reasonable access to the telephone, and . . . such use is protected by the First Amendment."  Washington v. Reno, 35 F.3d 1093, 1100 (6th Cir. 1994) (quotations and citations omitted). This right is not unlimited, but rather is subject to reasonable security limitations.  See id.  Regarding due process, "if a restriction or condition is not reasonably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees . . . ."  Bell v. Wolfish, 441 U.S. 520, 539 (1979).

Given contends that he should not be subjected to monitoring of his phone calls because he has never been suspected of using

the phones for any improper purpose.  DOC officials admit that
the phone settings can be adjusted on an individual basis to only
monitor certain calls of particular residents.  (Barthel, I-8,
124).  DOC counters that the blanket monitoring policy is
necessary to ensure criminal and other inappropriate activities
do not occur over the phone.  (Corsini, I-6, 20-21).  For
example, through phone monitoring, DOC officials learned of
threats being made by residents, including one instance when a
resident attempted to coerce an individual to lie during court
testimony.  (Smith, I-9, 28-30).  The telephone policy does not
violate Given's First Amendment or due process rights because DOC
has proven that the monitoring policy is reasonably related to
security at the Treatment Center.  Furthermore, Given has offered
no evidence that the telephone policy hinders his ability to keep
in contact with family and friends.

## VII. **THE REMEDY**

Plaintiffs seek injunctive relief and a declaratory
judgment.  Permanent injunctive relief is appropriate when a
plaintiff has demonstrated: "(1) that [he] has suffered an
irreparable injury; (2) that remedies available at law, such as
monetary damages, are inadequate to compensate for that injury;
(3) that, considering the balance of the hardships between the
parties, a remedy in equity is warranted; and (4) that the public
interest will not be disserved by a permanent injunction." Esso

Standard Oil Co. v. Lopez-Freytes, 522 F.3d 136, 148 (1st Cir.
2008) (citing eBay Inc. v. MercExchange, 547 U.S. 388, 390
(2006)).  In order to moot a request for permanent injunctive
relief, the defendant must meet the "'heavy burden' of showing
that it is 'absolutely clear that the allegedly wrongful behavior
could not reasonably be expected to recur.'"  Brown v. Colegio De
Abogados De P.R., 613 F.3d 44, 49 (1st Cir. 2010)(quoting Friends
of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S.
167, 189 (2000)).  "The Declaratory Judgment Act, 28 U.S.C. §§
2201-2202, empowers a federal court to grant declaratory relief
in a case of actual controversy."  Ernst & Young v. Depositors
Econ. Protection Corp., 45 F.3d 530, 534 (1st Cir. 1995).

A.   **Pharmacological Treatment**

     Defendants contend that the Court should not grant an
injunction as a remedy for plaintiffs' pharmacological treatment
claims because they have agreed to evaluate Healey and Given for
drug therapies, and draft protocols are in the works to serve as
a basis for their evaluations.  In other words, defendants seem
to claim the issue is moot.  In response, plaintiffs argue that
by not evaluating Healey and Given for pharmacological treatment
using professionally acceptable standards for so many years after
the treatment was requested, the DOC has not provided them access
to mental health treatment that gives them the opportunity to
improve the mental condition for which they were confined.

In the court's view, an injunction is warranted and in the public interest because plaintiffs have proven that the DOC is not committed to providing a meaningful pharmacological component to the sex offender treatment program.  DOC staff testified that its pharmacological program would be instituted by February 2012, yet, to the best of the court's knowledge, the protocols have not been finalized as of the writing of this opinion.  Although the case has been pending for over ten years, and the mental health contract provides for such services, none has been voluntarily provided to date to any committed sex offender at the Treatment Center.  I conclude that the DOC will not provide the evaluation and, if applicable, treatment without a court order, and that plaintiffs will suffer irreparable harm by not getting adequate treatment. See e.g., Battista, 645 F.3d at 455.  Accordingly, I hold that the DOC defendants must evaluate Healey and Given forthwith for pharmacological treatment using professionally acceptable standards, and if appropriate under these standards, provide them such treatment.  The Court also orders that declaratory judgment be entered in favor of Healey and Given that the Treatment Center's failure to provide adequate psychopharmacological evaluations violates the Amended Management Plan and their Fourteenth Amendment substantive due process rights (Healey, Counts I & IV; Given, Count IV).

**B.   Community Access Program**

Defendants contend the court should not grant an injunction with respect to the community access program claims.  In their view, plaintiffs are not eligible for the program, and consequently, have not suffered irreparable harm.

The Court declines to order injunctive relief for Healey because he has not demonstrated he has suffered irreparable harm. Healey has filed multiple applications to the community access program.  <u>See</u> Exs. 63-66 (Healey Achievement Matrices 2005-2008); (Peltzman, II-4, 8-9).  However, his applications were futile because he had not been admitted into the CTH when he applied and was not eligible for the CTH either.  Although the DOC may have contributed to Healey's injury by not providing him pharmacological treatment, his ineligibility for the CTH and community access program is due to his persistent behavioral problems, not to the Treatment Center's failure to provide clear benchmarks and prerequisites.

With respect to Given, the analysis is complicated because he only asserts a constitutional claim.  The court found that defendants violated the Plan and the state statute in not having a functioning community access program, but Given has not stated a claim under the Plan or state statute.  Because plaintiffs have not met their burden of proving that the de facto elimination of the community access program violates the Constitution, the Court declines to order an injunction for Given.

111

C.    **The Amended Management Plan**

Finally, the Court orders the DOC to follow the Amended Management Plan in all material respects, including keeping the Community Transition House open, subject to the operational discretion to adjust to changing conditions and evolving standards of treatment and security.  An order requiring the DOC to follow the Amended Management Plan is necessary and in the public interest because of the evidence of ongoing violations.

Most significantly, the Court has found that the failure to provide a functioning community access program violates the Amended Management Plan and state statute.  The lack of clear benchmarks and high barriers to entry have unreasonably hindered residents' access to the CTH and the community access program. To correct this violation, the DOC must provide clear, written benchmarks regarding which courses residents must pass under the new "good lives" model to gain admission to the CTH and community access program, how credit is given for old courses under the model, a written statement outlining the process, and an anticipated timeline for evaluating applications for the CTH and community access program, which is consistent with the timeline in the Amended Management Plan.  The DOC must also provide timely written reasons for any rejection from the CTH or community access program.  Without a continuing court order, the DOC will fail to meet the requirements of the Plan and state statute.

112

As added proof of the need for an order, this litigation to enforce the Amended Management Plan prompted the DOC to begin to make improvements, including but not limited to (1) reinstatement of social and community activities, which had been eliminated; (2) initiating a process for the development of pharmacological protocols to treat and evaluate residents; (3) changes to the practice of encouraging residents to disclose uncharged conduct as part of treatment; (4) reinstatement of the procedural safeguards provided in the Amended Management Plan for the MPU; (5) provision of toilets in the outdoor exercise area; and (6) placing a roof on the wire exercise cage.  As stated in the opinion, some of these problems constituted violations of the Plan.  However, the Court rejects the broad sweeping relief sought by plaintiffs on the ground this is not a class action, and plaintiffs have not demonstrated standing or grounds for much of the requested relief.

**D.    Other Claims**

The Court orders that judgment be entered in favor of the DOC defendants on Healey's claims that withholding psychological care violates his Eighth Amendment rights (Healey, Count III) and forcing him to exercise in the wire cage violates his due process rights (Healey, Count V).  The Court also orders judgment be entered in favor of the DOC defendants on Given's claims that conditions at the Treatment Center violate his due process rights

(Given, Count I), the Treatment Center's telephone system violates his First Amendment and due process rights (Given, Count II), the waiver of confidentiality to obtain sex offender treatment violates his Fifth Amendment rights (Given, Count III), and the Treatment Center's accommodations fail to meet the minimum standards for human habitation. (Given, Count V).

## VIII. ORDER

The Court orders the following:

(1) The DOC defendants must meet the requirements of the Amended Management Plan in all material respects as stated in the opinion, including instituting a functioning community access program.

(2) The DOC defendants must have Healey and Given evaluated by a qualified psychiatrist and, if appropriate, provide them pharmacological treatment.

(3) Declaratory judgment be entered that the Treatment Center's failure to provide adequate psychopharmacological evaluations violates the Amended Management Plan and the Due Process Clause of the Fourteenth Amendment.

(4) Declaratory judgment be entered that the Treatment Center's failure to provide a functioning community access program violates the Amended Management Plan and state statute.

(5) Dismissal of the following claims: Healey Counts III and V, and Given Counts I, II, III, and V.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge